[No. F037477. Fifth Dist. Aug. 31, 2005.]

DANIEL HORSFORD et al., Plaintiffs and Appellants, v.
THE BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY,
Defendant and Appellant.

[No. F038607. Fifth Dist. Aug. 31, 2005.]

DANIEL HORSFORD et al., Plaintiffs and Appellants, v.
THE BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY,
Defendant and Respondent.

**COUNSEL**

Law Office of Dean B. Gordon, Dean B. Gordon; Johnson & Beck, Mark D. Johnson; Murray & Associates, Lawrence D. Murray; Law Offices of Richard M. Pearl and Richard M. Pearl for Plaintiffs and Appellants.

Farmer, Murphy, Smith & Alliston, George E. Murphy and Suzanne M. Nicholson for Defendant and Appellant and for Defendant and Respondent.

Opinion

**VARTABEDIAN, Acting P. J.**—This case involves an appeal and cross-appeal from judgment for the plaintiffs in an employment discrimination action. Defendant and appellant Board of Trustees of California State University (the Trustees) primarily contends insufficient evidence establishes an entitlement to the relief awarded to plaintiffs Daniel Horsford, Richard Snow, and Steven King. Plaintiffs, as cross-appellants, primarily contend the trial judge had an undisclosed conflict of interest that should have disqualified him from presiding in this matter, that the court abused its discretion in granting the Trustees' new trial motion upon condition of a remittitur of damages, and that the court erred in denying plaintiffs' request for an injunction against implementation of the Trustees' affirmative action plan. Because we conclude neither side has established reversible error, we affirm the judgment on the merits.[1]

In a subsequent appeal, consolidated with the appeal on the merits by order of this court, plaintiffs contend the trial court abused its discretion in its award of statutory attorney fees. We agree and remand the matter for a new determination of the amount of attorney fees to be awarded to plaintiffs' counsel.

## FACTS AND PROCEDURAL HISTORY

A. *The Plaintiffs*

Plaintiff Steven King was a lieutenant with the campus police department of California State University, Fresno (CSUF) in 1993. As such, he was second in command of the department and served as acting chief when the chief of police, William Anderson, was unavailable. Anderson retired on December 31, 1993. King was appointed interim chief by CSUF's vice-president of administration, Benjamin Quillian. King applied for the permanent position of chief. He was not selected, however, and—for a time—remained lieutenant and second in command under the new police chief, Willie Shell. After being transferred to a position as director of an auxiliary public safety entity, King retired from CSUF. When Shell resigned in 1997, King applied for the position of chief; he was not hired.

---

[1] Even though the reporter's transcript in this case exceeds 14,000 pages and the clerk's transcript is well in excess of 18,000 pages, the parties have filed various requests for judicial notice and augmentation of the record, including a request for augmentation filed a week before oral argument. We grant those various requests and consider those additional documents for whatever light they properly may shed on the issues on appeal.

Plaintiff Richard Snow was one of the senior or administrative sergeants of the CSUF police department in 1993. Although Snow remained a sergeant throughout the events involved in this case, his duties were reduced at various times. When Shell resigned, Snow applied for the position of chief; he was not hired.

Plaintiff Daniel Horsford was an investigator for the CSUF police department. After an extended and involuntary administrative leave, Horsford was assigned in 1996 to a nonpolice public safety position. Eventually he received reinstatement as a police officer, but not as an investigator. He left the force in December of 1996 after a tenure of approximately 15 years.

Plaintiffs identify themselves in their first amended complaint as Caucasians.

B. *The Defendants*

The Board of Trustees of the California State University operates CSUF, as well as other campuses throughout the state. The complaint named additional defendants, including the CSUF president, a vice-president, former police chief Shell, and others. Ultimately, however, the court granted judgment in favor of all individual defendants. Accordingly, as noted above, we will refer to appellant board as the Trustees; we will refer to the university in Fresno as CSUF.

C. *Issues on Appeal*

The jury was provided special verdict forms concerning the Trustees' liability to each of the three plaintiffs. As to all three, the jury found the Trustees liable for discrimination based on race under the Fair Employment and Housing Act, Government Code section 12900 et seq. (hereafter FEHA). As to King and Snow, the jury found the Trustees liable for retaliation in violation of Labor Code section 1102.5, subdivision (b) (whistleblower protection). As to King, the jury found the Trustees liable for constructive termination of employment in violation of public policy.

In the damages portion of the verdict, by contrast, the jury was simply asked, as to each plaintiff, whether the Trustees' "unlawful conduct caused Plaintiff injury, damage, loss or harm." After answering "yes" for each plaintiff, the jury was directed to assess economic and noneconomic damages for each plaintiff for the undifferentiated "injury, damage, loss or harm."

The Trustees' opening brief attacks the finding of liability on each cause of action. It begins by attacking the retaliation claim on the basis of the statute of limitations and the failure of plaintiffs to produce substantial evidence of

retaliatory conduct occurring within the limitations period. The brief then attacks the sufficiency of the evidence to establish King's constructive discharge claim. Finally, the brief attacks the finding of liability in favor of all three plaintiffs based on race discrimination, contending in various ways there was insufficient evidence to establish the Trustees' liability.

Because of the nature of the damages verdict, which does not distinguish among the various theories of liability, we consider it more appropriate to begin with the Trustees' final claim, that there is no substantial evidence of discrimination against the three plaintiffs. If substantial evidence supports each plaintiff's discrimination cause of action, as we ultimately determine that it does, issues arising from the retaliation and wrongful discharge counts are moot: nothing we would do with respect to those counts would have any effect on the amount of the judgment awarded by what, in essence, was a general verdict when there is no reason to believe the jury apportioned the damages. (See *Roberts v. Ford Aerospace & Communications Corp.* (1990) 224 Cal.App.3d 793, 799 [274 Cal.Rptr. 139].) Accordingly, and pursuant to the relevant standard of review, we set forth the facts of the discrimination claim in the light most favorable to plaintiffs as the prevailing parties. (See *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].)

With respect to these discrimination-related facts, there is no issue concerning the statute of limitations and we need not consider the merits of the Trustees' arguments concerning the inapplicability of the "continuing course of conduct" theory, under which an employer may be liable for actions occurring outside the limitations period if the actions are sufficiently linked to unlawful conduct within the limitations period. (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1044 [32 Cal.Rptr.3d 436, 116 P.3d 1123].) Therefore, our summary of the evidence focuses on evidence relevant to the discrimination causes of action about which there is no statute of limitations issue.

D. *Discrimination Against King*

King, as mentioned, was the sole lieutenant in the CSUF Police Department; he was interim chief of police until Willie Shell was hired in August of 1994. Shortly after Shell arrived, he removed King from the chain of command by requiring the department's sergeants to report directly to Shell, instead of the prior practice of reporting to King. At some point, Shell was redesignated director of public safety and King was the assistant director of public safety.

After about a year, Shell reassigned King to a position as interim head of environmental health and safety, a division of the department of public safety

in charge of reducing and otherwise dealing with such hazards as asbestos, chemical waste and spills, and electrical current emergencies. King retained his title as assistant director of public safety, but his new position was not a law enforcement position and was physically located outside the police department.

At the time of this transfer, King was packing up belongings from his old office, which was next door to Shell's. Shell, who is African-American, commented to an African-American police officer that he was "moving those white boys out of here." This employee assumed this comment referred to King "because he was packing up and sort of moving out of the department" at the time of the comment.

King had little training for the task of running the environmental health department, and the assignment to the position was supposed to be on an interim basis. After about 18 months and substantial criticism by Shell about King's performance in the job, however, there was no promise to bring King back to the police department. King decided he was being set up for termination of his employment; because he perceived that senior officers had difficulty obtaining comparable employment if their records contained even minor negative history, King decided to seek employment elsewhere before he was terminated. He obtained the position of chief of campus police at a private college in the San Francisco area. After Shell resigned as CSUF chief, King applied for that job; he was not interviewed for the position and a Caucasian female was selected as the new chief.

E. *Discrimination Against Snow*

Snow had hoped King would be promoted to chief but Shell was hired instead. Snow further hoped to be promoted to lieutenant if King vacated that position to become chief. When those events did not occur, Snow was overt in his disappointment. Shell apparently suspected that Snow's attitude reflected not just this disappointment but, in addition, resentment that the new chief was African-American. Shell frequently asked an African-American officer whether she had seen Snow do anything that appeared racist. (The officer repeatedly said she had not seen any such conduct.)

Shell frequently called Snow into his office and criticized him for disappointing job performance. When Snow asked what Shell wanted him to do, Shell replied only that Snow "knew" and that Shell "wanted more."

On one occasion, Snow stopped a car on campus and confiscated a six-pack of beer from students in the car. Snow wrote in his incident report that he had disposed of the beer, giving specific details of time, place, and

method of disposal. When an officer inspected Snow's cruiser before taking it out on a subsequent shift, the officer found the six-pack in the trunk of the cruiser. He took the beer into the police station and reported his discovery.

Shell told Snow he was going to fire him over the incident and threatened criminal prosecution for making a false official report. Shell's superiors overrode these dispositions, but Snow still was suspended with pay for two weeks for falsifying the report. By contrast, an African-American officer had lost a small quantity of marijuana after seizing it from a suspect who was not arrested. That officer was not disciplined for the incident. Shell offered as an explanation of the different treatment of the two incidents that Snow had a leadership role that made his error more culpable than the African-American officer's.

After King retired, Snow applied for the lieutenant position. After Shell retired, Snow applied for chief. In neither case was he hired, nor was he among the candidates who received an interview. At the time of trial, he was still employed as a sergeant with the CSUF police department.

## F. Discrimination Against Horsford

Shortly after Shell arrived as chief of police, a female officer was flagged down in a dormitory parking lot by a 17-year-old girl. She said her boyfriend, Michael Pittman, had hit her and she asked the officer to intervene. The officer entered the dorm and spoke to Pittman, a CSUF football player and an African-American. He was belligerent and threatening, according to the officer. She "felt that if I would have tried to take some sort of action against him, based on his comments, that there could have been a physical altercation." Instead of arresting Pittman, the officer filed a report recommending the case be referred to the district attorney for prosecution.

Horsford was certified as and held the position of investigator in the CSUF police department. Among his duties was to review police reports and, when he was satisfied they were sufficiently complete, take them to the district attorney's office for consultation with the deputy district attorney in charge of intake. The morning after the foregoing incident, before Horsford left for the district attorney's office, he was summoned to Shell's office. Horsford was told not to take the report to the district attorney. Horsford explained to Shell he thought the incident involved rather serious charges, including domestic battery, unlawful intercourse with a minor, and resisting arrest. Shell reiterated his order, saying that they were not going to file a case just because an officer "got her feelings hurt." Shell said the suspect should have been arrested at the scene but that, since that did not happen, he was not going to permit further action on the report.

Horsford then went next door to King's office and began to discuss the matter. Shell called both men back to his office and reiterated that the case was not to be referred to the district attorney.

A few months later, Shell removed Horsford from his position as investigator and assigned him to duty as a dormitory officer. In the dorms, Horsford found himself answering both to the housing administration and the chief of police. He expressed frustration to a fellow officer and announced that he "didn't know what [he] might do." This was reported to Shell, who thought this reflected a danger that Horsford might become violent in the workplace. Shell consulted with other departmental supervisors. Without interviewing Horsford or getting further information, Shell suspended Horsford with pay pending psychological clearance to return to work.

Horsford submitted to a psychological evaluation and was cleared to return to work. The psychologist suggested, however, that Horsford might benefit from anger management counseling. Shell thought these were inconsistent dispositions of the matter and declined to reinstate Horsford to active duty until he was cleared by a second psychologist. After that clearance, Shell still refused to allow Horsford to return to work.

By this point, King had been transferred to the environmental health and safety department. He offered to allow Horsford to return to work in King's department—that is, not as a peace officer—in the hope Shell would see Horsford display an appropriate demeanor at work so he would permit Horsford to return to active police duty. Horsford began working in the environmental health department.

Shell persisted in his refusal to reinstate Horsford as a police officer; Horsford sought work elsewhere. In October of 1996, Shell advised Horsford by memo he was being reassigned to the police department, as a patrol officer, effective October 31, 1996. (Shell testified it had taken this long for Horsford to complete an anger management program.) A few days after receipt of the memo, Horsford informed Shell he had been offered a job as an investigator for the Department of Motor Vehicles (DMV) and would be leaving CSUF employment soon. Horsford's last day of work at CSUF was December 6, 1996.

G.  *Other Evidence of Racially Motivated Actions by Shell*

There was extensive evidence of racial preference in hiring and promotion by Shell. There was evidence of race-conscious provision of police services at Shell's direction. There was evidence of comments by Shell concerning the racist attitudes of law enforcement generally and the adjacent city police

department in particular. There was evidence that Shell continued to question an African-American patrol officer about the racial attitudes of her colleagues, even though the officer repeatedly informed Shell the colleagues were not racist.

## H. *The Judgment and Postjudgment Proceedings*

After many preliminary maneuverings by both sides, jury trial began on May 16, 2000, and continued through mid-August of that year. The following causes of action were submitted to the jury: race discrimination (Gov. Code, § 12940, all three plaintiffs); retaliation (Lab. Code, § 1102.5, King and Snow only); constructive discharge in violation of public policy against race discrimination (King only). By special verdict on issues of liability, the jury found in favor of plaintiffs on each submitted cause of action. On the issue of damages, the jury found as follows:

| | | |
|---|---|---|
| Steven King | Economic damages — | $300,000 |
| | Noneconomic damages — | $1,000,000 |
| Richard Snow | Economic damages — | $0 |
| | Noneconomic damages — | $1,200,000 |
| Daniel Horsford | Economic damages — | $250,000 |
| | Noneconomic damages — | $1,500,000 |

The trial court granted the Trustees' motion for new trial, but ordered the new trial motion denied if plaintiffs consented to remittitur of excessive damages. Plaintiffs consented to the remittitur and judgment was entered, as follows:

| | | |
|---|---|---|
| King | Economic damages — | $194,140 |
| | Noneconomic damages — | $275,000 |
| Snow | Noneconomic damages — | $250,000 |
| Horsford | Economic damages — | $98,386 |
| | Noneconomic damages — | $300,000 |

The court denied plaintiffs' request for an injunction against implementation of CSUF's affirmative action plan. The parties filed timely appeals.

Subsequently, plaintiffs filed a motion for award of attorney fees in the amount of $3,331,338.25. The court awarded plaintiffs attorney fees in the amount of $1,222,764.50. Plaintiffs filed a timely appeal.

## DISCUSSION

### *I.  The Trustees' Appeal on the Merits*

The Trustees attack the sufficiency of the evidence to support the verdict on two fronts. First, they contend plaintiffs did not suffer "adverse employment action" sufficient to constitute a violation of FEHA. Second, they contend plaintiffs failed to "present substantial evidence that the reasons given for these employment decisions were pretextual, or that the real reason was plaintiffs' race." Neither contention has merit.

### A.  *Adverse Action*

■   FEHA, among other prohibitions on discrimination, makes it unlawful for an employer "because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation of any person, . . . to discriminate against the person . . . in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).) The prohibition is often restated in judicial opinions as a requirement that the discriminatory action result in "adverse employment action." (*Yanowitz v. L'Oreal USA, Inc., supra,* 36 Cal.4th at p. 1042; see, e.g., *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (hereafter *Guz*).) In some cases, adverse action affecting "terms, conditions, or privileges of employment" (actionable) is contrasted with changes that merely displease the employee (not actionable). (See *Thomas v. Department of Corrections* (2000) 77 Cal.App.4th 507, 511 [91 Cal.Rptr.2d 770].) In other words, changes in terms and conditions of employment must be both substantial and detrimental to be actionable. (*Id.* at p. 512.) "Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of [Government Code] section[] 12940[, subdivision] (a)." (*Yanowitz v. L'Oreal USA, Inc., supra,* 36 Cal.4th at p. 1054.)

The Trustees assert that none of the actions taken against plaintiffs constitute anything more than minor or relatively trivial lateral transfers with which plaintiffs were simply unhappy.

■   We disagree. First, we note that the jury was not required to consider each individual mistreatment of a plaintiff in isolation. The jury was entitled

to, and on substantial evidence review we are required to, "consider collectively the alleged [discriminatory] acts[. T]here is no requirement that an employer's [discriminatory] acts constitute one swift blow, rather than a series of subtle, yet damaging injuries." (*Yanowitz v. L'Oreal USA, Inc., supra,* 36 Cal.4th at p. 1055.)

Next, taken together, the actions taken against each plaintiff clearly were substantial and detrimental. When a police lieutenant (King) is removed from his former position near the top of the department's chain of command, and then is removed entirely from law enforcement duties, the objective terms and conditions of employment have been adversely affected. When that same veteran police administrator is transferred to head a department in which he has no training or expertise (and in which position he was inferably expected to fail), the terms and conditions of employment have been adversely changed. These changes, in themselves, may have been consistent with the terms and conditions of King's employment by CSUF. Nevertheless, the changes were substantial and detrimental; when motivated by racial animus (to which we turn in the next part of this opinion) the changes constituted actionable adverse employment action. (See generally *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1456–1457 [116 Cal.Rptr.2d 602].)

Similarly, in the particular factual context of employment as a peace officer, suspension from duty for lying on a police report (Snow), even if the leave is with pay, constitutes adverse employment action. As Shell himself testified, such a charge can destroy a police officer's career. Reduction in authority and negative performance reviews also constitute adverse employment action. Again, the real issue is whether the actions were taken for legitimate managerial reasons or were, instead, significantly motivated by racial animus.

The actions taken against Horsford are even more clearly actionable, yet the Trustees claim they were not adverse because he remained on the payroll and eventually returned to active peace officer status at his original rank and salary. Horsford was, however, removed from a highly desirable position as the investigative officer for the department and was placed on administrative leave for a period of months as a result of Shell's claim that Horsford was mentally unstable. In Horsford's case—unlike the circumstances of King and Snow—the jury reasonably could have concluded the employment action violated Horsford's rights under the collective bargaining agreement and that the administrative leave, as a matter of the underlying facts, was unjustified both initially and in its duration. We conclude, however, that even if the management actions were permissible in other contexts, those decisions still resulted in adverse employment action. As such, if the transfer and suspension resulted from racial animus, they are actionable under FEHA. (See Chin

et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2004) ¶ 7:104.1, p. 7-18 [discussing same operative language in title VII, as applied in federal employment cases].) We turn to the racial animus question.

### B.  *Causation—Proof of Racial Motivation*

■  A plaintiff in a racial discrimination action has the burden of proving, as the jury was instructed here, that the plaintiff's race was a substantial factor in the adverse employment decision. (See *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1756 [52 Cal.Rptr.2d 620].) Our required standard of review is simply to determine whether the jury had before it substantial evidence from which it reasonably could conclude the challenged employment actions were motivated in substantial part by reasons of race. (See *Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156, 1166 [104 Cal.Rptr.2d 95]; cf. *Heard v. Lockheed Missiles & Space Co., supra,* at p. 1752.)

The Trustees, disregarding the foregoing principles, assert a number of "rules" and "standards" that plaintiffs, in their view, failed to satisfy. For example, the Trustees contend plaintiffs failed to establish a prima facie case, that plaintiffs failed to prove the Trustees' asserted reasons for the adverse employment actions were "pretextual," and that plaintiffs failed to present "specific" and "direct" evidence of intentional discrimination. Without meeting these requirements, the Trustees claim, plaintiffs presented evidence from which the jury could only "<u>speculate</u> that race may have played a part in these decisions."

■  While there are frameworks in discrimination cases for analyzing the shifting burdens on the parties at various stages of the litigation, such as the so-called *McDonnell Douglas* test (see *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817]), these frameworks were "never intended to be mechanical or ritualistic." (*Heard v. Lockheed Missiles & Space Co., supra,* 44 Cal.App.4th at p. 1755.) Further, they are most useful at preliminary stages of litigation, such as summary judgment and nonsuit, where the shifting burdens of proof and persuasion permit a sequential analysis of the parties' evidentiary offerings. Once the case is submitted to the jury—and, therefore, for substantial-evidence review on appeal—these frameworks drop from the picture and traditional substantial evidence review takes their place in the analysis. (See *id.* at p. 1750.)

Cases discussing these preliminary analytical frameworks, upon which the Trustees rely for their assertion of various proof requirements, arise in a different context and are inapplicable here. A typical case, upon which the Trustees place great reliance, is *Guz v. Bechtel National, Inc.* (2000) 24

Cal.4th 317 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (hereafter *Guz*). They contend *Guz* requires plaintiffs "to produce <u>specific and substantial evidence of pretext</u> [or else] the employer is entitled to judgment as a matter of law."

*Guz* arose on the defendant's motion for summary judgment. In opposition to the motion, the employee asserted a prima facie case of age discrimination based on the defendant's overall better treatment of younger employees during a corporate downsizing. (*Guz, supra,* 24 Cal.4th at pp. 357, 367.) While a defendant is entitled to submit a summary judgment motion on the theory that the plaintiff has not established a prima facie case, the defendant in *Guz* chose in addition to submit detailed evidence concerning its nondiscriminatory reasons for the personnel actions taken during the downsizing. (*Id.* at p. 357.)

Plaintiff Guz then submitted evidence attempting to show that the employer's reasons were not believable and were pretextual (that is, if true in themselves, the reasons were not the actual motivation for the personnel actions). The Supreme Court noted that where the employer's asserted reasons are, in fact, unbelievable, such evidence may " 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons." (*Guz, supra,* 24 Cal.4th at p. 361, quoting *St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 521 [125 L.Ed.2d 407, 113 S.Ct. 2742].) In the case before the court, however, the asserted nondiscriminatory reasons were wholly believable, so the plaintiff was not entitled to this inference of nefarious reasons for hiding the employer's true motivation. (*Guz, supra,* at p. 361.)

However, Guz also asserted that his comparative-age evidence (that is, evidence independent of his own circumstances, that younger employees fared better in the downsizing) created a triable issue of fact that would permit a jury to conclude that the employer intentionally discriminated on the basis of age, even in the absence of evidence that the employer had treated plaintiff, in particular, differently. (*Guz, supra,* 24 Cal.4th at pp. 367–368.) In rejecting this argument, the Supreme Court stated that there was no evidence the employer lied about its non-age-related reasons for discharging the plaintiff and that, in the absence of such evidence directed at the plaintiff's own situation, the general statistical showing of preferential treatment of younger workers was insufficient to permit a jury to infer intentional discrimination against the plaintiff. (*Id.* at pp. 366, 370.)

Thus, *Guz, supra,* 24 Cal.4th 317, stands for the limited proposition that where the defendant has made a strong showing that its personnel decisions were not based on an impermissible discriminatory factor, the plaintiff cannot prevail merely by showing the personnel decisions negatively impacted a

protected group. (See *id.* at p. 367; see also *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1734–1735 [35 Cal.Rptr.2d 181].) Neither *Guz* nor any other case cited by the Trustees stands for the proposition that any particular form or quality of evidence is required for a plaintiff to establish intentional discrimination. A plaintiff's burden is, as stated above, to produce evidence that, taken as a whole, permits a rational inference that intentional discrimination was a substantial motivating factor in the employer's actions toward the plaintiff. (See *Guz, supra,* 24 Cal.4th at p. 361; see also *Yanowitz v. L'Oreal USA, Inc., supra,* 36 Cal.4th at p. 1046.)

■ As their argument progresses beyond the claims of technical proof requirements—and to the true issue of substantial evidence to permit an inference of race discrimination—the Trustees unwind the various strands of plaintiffs' evidence, discounting each strand, in an attempt to show that "the jury could only <u>speculate</u> that race may have played a part in these decisions." (Original underlining.) We are, by contrast, constrained by the standard of review to examine the whole record, including reasonable inferences the jury may have made. (See *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; *In re James D.* (1981) 116 Cal.App.3d 810, 813 [172 Cal.Rptr. 321].) Circumstantial evidence of motivation does not unravel into "speculation" when the evidence permits inferences that are "the product of logic and reason." (*Louis & Diederich, Inc. v. Cambridge European Imports, Inc.* (1987) 189 Cal.App.3d 1574, 1584–1585 [234 Cal.Rptr. 889]; see *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 121 [184 Cal.Rptr. 891, 649 P.2d 224].) "It is therefore appropriate that we consider plaintiff's allegations collectively." (*Yanowitz v. L'Oreal USA, Inc., supra,* 36 Cal.4th at p. 1056.)

To start, the Trustees address the more general evidence of Shell's racism. They review the evidence at length, drawing from it all the inferences favorable to their position and ignoring inferences favorable to plaintiffs. Viewed in the light most favorable to the judgment, however, the evidence permitted a reasoned inference that Shell was pervasively motivated by racial considerations whenever the opportunity presented itself. This evidence of overall attitude and actions was relevant evidence to support the related inferences that either Shell's asserted reasons for the adverse actions toward plaintiffs were pretextual or, even if the asserted reasons contributed to the actions, racial animus also was a substantial factor in the decision. (See *Guz, supra,* 24 Cal.4th at pp. 356, 361, 363.)

Next, the Trustees dismiss plaintiffs' most direct evidence of Shell's racial motivation, namely his comment while King was packing his desk for his exile to the environmental health department that Shell "was moving those white boys out of here." The Trustees discount this statement because

"Shell did not identify to whom he was referring when he allegedly made this statement." The witness to the statement, however, testified that when Shell made the statement King "was packing up and sort of moving out of the department" and she "assumed" the "white boy" in question was King.

Finally, the Trustees assert that plaintiffs "presented no direct evidence that any of the . . . reasons for the employment actions taken were pretextual . . . . Plaintiffs relied entirely on circumstantial evidence from which the jury could only speculate that race may have played a part in these decisions." As their legal authority in support of this claim, the Trustees cite *Martin v. Lockheed Missiles & Space Co., supra,* 29 Cal.App.4th at page 1735. That was an age discrimination case. In upholding summary judgment for the defendant, the court stated that the plaintiff employee had failed to present any material evidence that the defendant had discriminated against her. (*Id.* at p. 1734.) The plaintiff presented no evidence that a younger, less qualified person had taken her job during an overall reduction in force. (*Id.* at p. 1733.) The plaintiff presented no evidence from which to infer that her initial statistical showing of adverse impact of employment decisions on older employees had any relationship to the particular evaluation process that resulted in her termination. (*Id.* at p. 1734.) In this context, the court stated that the plaintiff's own assertion that there was an issue for the jury was mere speculation that could not forestall summary judgment. (*Id.* at p. 1735.) The court recited the rule that to defeat summary judgment when an employer has established legitimate reasons for the employment action, the plaintiff must "produce 'substantial responsive evidence' that the employer's showing was untrue or pretextual. . . . For this purpose, speculation cannot be regarded as substantial responsive evidence." (*Ibid.,* citation omitted.)

In the present case, there was substantial responsive evidence, albeit circumstantial: Plaintiffs presented evidence that King was a wholly inappropriate choice to direct the environmental health department; in addition, Shell's "move out the white boys" comment strongly implied that his stated reason for reassigning King was a sham. Plaintiffs presented evidence that Snow's rather minor job infractions did not merit the discipline imposed—and that similar infractions by an African-American officer resulted in no discipline. Plaintiffs presented evidence that Horsford was far overqualified for the transfer to dormitory duty and that the transfer violated Horsford's vested job rights—that is, that Shell's asserted reasons made no sense. They presented evidence that Horsford's expression of frustration with the move was reasonably construed as no threat of violence or other action that would support Horsford's suspension from the police force. In each instance, this was not simply evidence that Shell's personnel decisions were ill-advised. Rather, if credited by the jury, the evidence established a disparity between Shell's asserted reasons and the underlying facts that was strong evidence the asserted reasons were mere makeweights. (See *Horn v. Cushman*

& *Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807 [85 Cal.Rptr.2d 459]; cf. *Yanowitz v. L'Oreal USA, Inc., supra,* 36 Cal.4th 1046.)

In summary, we find the Trustees' attack on the evidence to be unsupported by the law and to be based on a view of the record that fails to present the evidence in the light most favorable to the verdict. We conclude the verdict is supported by substantial evidence.

## II. *Plaintiffs' Cross-appeal from the Conditional Grant of New Trial*

### A. *Introduction and Standard of Review*

Plaintiffs attack the order conditionally granting a new trial on two fronts. First, while recognizing that a trial court's findings upon granting such an order are entitled to the same deference normally accorded a jury verdict on appeal (see *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 411 [93 Cal.Rptr.2d 60, 993 P.2d 388]), plaintiffs contend the present order reflects "a manifest and unmistakable abuse of discretion." Second, plaintiffs contend the trial court suffered from a serious and unwaived conflict of interest that prevented it from sitting as an independent trier of fact in ruling on the new trial motion. Neither contention has merit.

The normal standard of review of an order granting a new trial motion is both well established and highly deferential. A new trial motion "is addressed to the judge's sound discretion; [the judge] is vested with the authority, for example, to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact; on appeal, all presumptions are in favor of the order as against the verdict, and the reviewing court will not disturb the ruling unless a manifest and unmistakable abuse of discretion is made to appear." (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112–113 [65 Cal.Rptr. 315, 436 P.2d 315].) In exercising its broad discretion, "the trial court may draw inferences opposed to those accepted by the jury, and may thus resolve the conflicting inferences in favor of the moving party, for 'It is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse the order of the trial court.' " (*Ballard v. Pacific Greyhound Lines* (1946) 28 Cal.2d 357, 359 [170 P.2d 465].) While the reviewing court must consider only those reasons for granting the motion stated by the trial court in its order, within those confines the question on appeal from an order conditionally granting a new trial on the basis of excessiveness of damages is simply "whether a verdict for an amount considerably less than that awarded [by the jury] would have had reasonable and substantial support in the evidence." (*Ona v. Reachi* (1951) 105 Cal.App.2d 758, 762 [233 P.2d 949].)

Plaintiffs attempt to avoid this deferential standard of review by contending the standard presupposes that the trial court acts independently and unencumbered by conflicts of interest. They contend the trial court's independence was undermined by undisclosed conflicts of interest; therefore, plaintiffs "urge this court to discard the normal deference afforded to a trial court sitting as an independent thirteenth juror, and instead conduct an independent review to determine whether substantial evidence supported the jury's determination of damages by its verdict." (The Trustees dispute the conflict assertion but argue that, if a conflict were found, reversal of the entire judgment would be in order. Plaintiffs disagree and seek only reversal of the new trial order. In light of our following resolution of the conflict issue, we need not resolve the scope-of-reversal question.)

## B. *The Conflict of Interest Issue*

### 1. *Facts.*

Judge Donald S. Black was appointed to the bench in 1998. On December 1, 1999, he was designated as judge for all purposes in the present case. At a hearing with counsel for all parties on December 29, 1999, counsel asked whether Judge Black had disqualifying conflicts of interest. Judge Black pointed out that, prior to his appointment, he had been with the Fresno law firm McCormick Barstow Sheppard Wayte & Carruth (hereafter McCormick). He acknowledged one of the attorneys in this case, Walter Whelan (representing Chief Shell), formerly had been at McCormick. He said his (Black's) wife was still an attorney with McCormick. He stated that he could not hear cases in which McCormick represented parties, but that he was not precluded from cases in which former McCormick attorneys represented parties. He said that, if the situation was a problem "with any of you, there are certainly, you know, procedural mechanisms for raising that." Judge Black also indicated he was president of the Fresno Philharmonic Association, and that the association was currently a defendant in an action brought by one of the plaintiffs' attorneys on behalf of a group called Save Our Symphony. Again Judge Black said this issue presented no problem for him, but that if anyone did have a problem with it, "there are certainly procedural things that can be done."

None of the attorneys sought to disqualify Judge Black and the case proceeded with pretrial matters for the next several months. In mid-May of 2000, jury trial began.

On June 23, 2000, Judge Black met with counsel in chambers to disclose that he recently had become aware that McCormick was representing the Trustees and California State University, Bakersfield, in a federal court

gender discrimination case. On the next court day, June 27, 2000, the parties made a record of the conference. Judge Black explained that McCormick's representation of the Trustees presented a conflict under Code of Civil Procedure section 170.1 because a judge is deemed to have represented a party in an action before him or her if, within the past two years, the party was a client of the judge or of a lawyer with whom the judge had been in private practice.[2] Plaintiffs filed written waivers of the conflict, and plaintiffs and defendants orally stated waivers of the conflict on the record.

There the matter stood for the next year. The trial was completed, the verdict was entered, and (in December 2000) the court conditionally granted the new trial motion. Then on May 18, 2001, the court entered its order awarding attorney fees in an amount substantially less than requested. Plaintiffs responded with a "motion for new trial" on the issue of attorney fees. As relevant here, plaintiffs claimed "irregularities in the proceedings of the court" as a basis for a new trial. (See Code Civ. Proc., § 657, subd. 1.) They claimed their waiver of the conflict of interest had been "coerced" and that the judge's alleged conflict had caused counsel "concern"; they alleged financial pressures made them waive the conflict.

By order of July 17, 2001, the court denied the new trial motion. The court found "there has been no showing of and there was no coerced waiver." The same day, plaintiffs filed their appeal from the orders awarding attorney fees and denying a new trial on that issue.

Nothing further happened on this issue for almost two more years. Then, on or about March 28, 2003, plaintiffs' counsel filed a verified statement of Lawrence D. Murray, purportedly pursuant to Code of Civil Procedure section 170.3, subdivision (c).[3] In addition to recounting a version of the foregoing facts about previous disclosures by Judge Black, Murray states:

---

[2] In relevant part, Code of Civil Procedure section 170.1 provides: "(a) A judge shall be disqualified if . . . [¶] . . . [¶] (2) The judge served as a lawyer in the proceeding, or in any other proceeding involving the same issues he or she served as a lawyer for any party in the present proceeding . . . . [¶] A judge shall be deemed to have served as a lawyer in the proceeding if within the past two years: [¶] . . . [¶] (B) A lawyer in the proceeding was associated in the private practice of law with the judge."

[3] In relevant part, Code of Civil Procedure section 170.3, subdivision (c), provides: "(1) If a judge who should disqualify himself or herself refuses or fails to do so, any party may file with the clerk a written verified statement objecting to the hearing or trial before the judge and setting forth the facts constituting the grounds for disqualification of the judge. The statement shall be presented at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification. . . . [¶] . . . [¶] (3) Within 10 days after the filing or service . . . the judge may file a written verified answer admitting or denying any or all of the allegations . . . ." The subdivision also provides a procedure for hearing and determination of the issue of disqualification.

"Although Judge Black did not identify the case by name, Plaintiffs' attorneys today identified that case as *Neal v. Board of Trustees*, case no 97-CV-5009. This case was originally filed in the United State District Court, Eastern District of California, Fresno branch on January 10, 1997. The Board of Trustees in that action is and has been represented . . . by attorney Lowell T. Carruth of the McCormick Barstow law firm, Judge Black's former firm, and the firm that employed and continues to employ Judge Black's wife."

Murray's verified statement also stated that on "March 26, 2003, [counsel] researched Fresno County Case Information on the Fresno Superior Court website to determine whether the McCormick Barstow law firm was representing or had recently represented the Board of Trustees . . . ." Counsel located a case filed in March of 2000 and still pending, in which, they claimed, McCormick represented CSUF in a writ of mandate proceeding.[4] They located other litigation involving the Trustees pending in Kern County, but were unable to determine whether McCormick represented the Trustees in those cases.

On April 7, 2003, Judge Black filed a 17-page verified answer to Murray's statement. Judge Black noted that immediately after the case was assigned to him, he disclosed to the parties at a status conference that he had been a partner of McCormick and that his wife still was an attorney at the firm. He said, however, that he had not "run a 'conflicts check' " at that time because he had "no means" to do so.

Judge Black's answer pointed out several important instances in which the Murray statement was demonstrably in error, and Judge Black discussed in detail Judge Black's own view of his reasoning in deciding issues in the case. He concluded he had not been biased in his decisionmaking. Even though he believed he had conducted the trial and posttrial proceedings fairly, however, Judge Black found that his *future* involvement in the case was problematical: "[A]s a result of the filing and content of the Murray Verified Statement, I find that I now have a substantial doubt as to my capacity to be impartial and I therefore disqualify myself. . . ."

As part of a request for judicial notice filed in this court, plaintiffs have included a certified copy of the docket in the *Neal* case. A portion of that docket lists counsel for the various parties. It includes Judge Black's wife, Deborah Ann Byron, as an attorney of record for the Trustees and related parties. The docket shows that Lowell Carruth of McCormick is currently

---

[4] The case was *McClatchy Company v. California State University* (Super. Ct. Fresno County, 2000, No. 0648361); see also *California State University, Fresno Assn., Inc. v. Superior Court* (2001) 90 Cal.App.4th 810 [108 Cal.Rptr.2d 870].

counsel for those entities and that Byron's participation as counsel of record terminated December 21, 1998 (noted in the docket as "term"). (As noted, the present case was assigned to Judge Black by order dated December 1, 1999.)

## 2. *Analysis.*

As suggested above, the claims concerning Judge Black's disqualification arise in a highly unusual context. That is, the plaintiffs did not request Judge Black's disqualification until more than two years after the entry of final judgment—and the judge recused himself in response to that request. Accordingly, this is not a challenge to an order denying a request for disqualification (required to be made by writ of mandate petition [Code Civ. Proc., § 170.3, subd. (d)]) nor is it an independent action attacking the validity of the judgment (see *Betz v. Pankow* (1993) 16 Cal.App.4th 931, 940–941 [20 Cal.Rptr.2d 841]). Instead, the claim is closer to the one made in *People v. Mayfield* (1997) 14 Cal.4th 668, 811 [60 Cal.Rptr.2d 1, 928 P.2d 485], that the actual bias of the trial judge deprived a party of due process. And in this case, the evidence that shows actual bias, according to plaintiffs, is the "arbitrariness" of the order for new trial itself.

Even assuming plaintiffs could (and intended to) raise the issue of disqualification (as opposed to actual bias) at this stage of the proceedings, their contention would be meritless because they did not timely assert the disqualification.

Before we address the issue of waiver, however, it is well to repeat this court's admonition in *Urias v. Harris Farms, Inc.* (1991) 234 Cal.App.3d 415, 425 [285 Cal.Rptr. 659]: "[W]e find no authority requiring a party or his counsel to investigate to ascertain a judge's former clients. Rather, the responsibility lies with the judge, especially when he is recently appointed to the bench, to disclose to the parties that a party to the proceeding was a client of his former law firm." Given the limited temporal duration of the Code of Civil Procedure section 170.1, subdivision (a)(2)(B) disqualification and the danger of inadvertent transgression by newly appointed judges, especially those from large firms with a diverse client base, it would seem prudent— indeed, almost necessary—for the newly appointed judge to obtain from his firm a listing of all clients represented during the two years immediately before the judge took the bench. In any event, it does not discharge a judge's duty in these instances to assert, as Judge Black did in his answer to the 2003 request for disqualification, that he had not told the parties he had run a conflicts check and he had "no means to run a 'conflicts check.' " Whether or not he made an express representation, the parties were entitled to infer from his silence on the matter that he had made a reasonable effort to determine whether he had a possible conflict in the case. (See *Urias v. Harris Farms, Inc., supra,* at p. 425.)

Nevertheless, in a manner not disclosed by the record, it came to Judge Black's attention that McCormick represented the Trustees in unrelated litigation within the time parameters of Code of Civil Procedure section 170.1, subdivision (a)(2)(B). As soon as he learned this information—but apparently without investigating it further—Judge Black disclosed what he knew to the attorneys in the present case: At that time and at the time Judge Black was appointed to the bench, McCormick represented the Trustees in a gender discrimination case involving California State University, Bakersfield. (It will be recalled that Judge Black previously had disclosed that his wife still worked at McCormick.) This disclosure was made in chambers on a Friday. The following Tuesday, without asking further questions of the judge or asking for a continuance to investigate, plaintiffs' counsel submitted written waivers by their clients, who then reiterated their waivers on the record.

Plaintiffs argue that these waivers were ineffective for several reasons—for example, that Judge Black's disclosure was not complete and the defendants did not submit written waivers of the conflict. Those arguments are unconvincing, but they also miss the point of the waiver at issue here: regardless of whether the plaintiffs effectively waived the conflict in 2000, we conclude they waived the conflict by the long period of inaction during which they should have discovered the details of which they now complain.

Plaintiffs have not shown that they made any effort to discover the additional disqualifying information in June of 2000 or that they reasonably could not have discovered the facts in a timely manner. (See *People v. Panah* (2005) 35 Cal.4th 395, 447 [25 Cal.Rptr.3d 672, 107 P.3d 790].) For example, plaintiffs criticize the Trustees' attorneys for not coming forward with the disqualification information they *must* have known, but plaintiffs do not assert that they actually requested such information from defendants' counsel. Nor did they move for sanctions against the Trustees, which they could have done in conjunction with asserting injury from having to act on the disqualification in June of 2000, a month into the trial. Had they done so, plaintiffs could have established all the facts at that time.

As another example, plaintiffs' counsel stated that they checked court records in 2003 and discovered the details concerning the conflicts, but they do not claim the same records did not exist or were unavailable in 2000.

■ In short, while Judge Black initially had (and failed to perform) the duty to determine whether he had conflicts, once plaintiffs were provided with information sufficient to permit inquiry, they had a duty to exercise reasonable diligence to determine the facts and act upon them; in failing to exercise such diligence, they waived disqualifications that reasonably would

have been disclosed. (*Britz, Inc. v. Alfa-Laval Food & Dairy Co.* (1995) 34 Cal.App.4th 1085, 1097–1098 [40 Cal.Rptr.2d 700].)

In addition, in the unique facts of this case, plaintiffs have failed to show than any incompleteness in Judge Black's disclosure of June 2000 was material. Plaintiffs discuss at some length the financial and tactical pressures that led them to waive the incompletely disclosed conflict in June of 2000. They imply they would have made a different choice—would not have waived the conflict—if they had known all the facts. However, Byron's role as counsel of record in the *Neal* case ended before Judge Black was assigned the present case; there is no indication in our record that Byron had any further role in *Neal* after she substituted out as counsel of record. McCormick's involvement in the *McClatchy Company* case was not different in kind than its involvement in the *Neal* case, except that there is no indication Byron was ever involved in that case at all and McCormick represented a university fund-raising affiliate, not the Trustees or CSUF. (See *California State University, Fresno Assn., Inc. v. Superior Court, supra,* 90 Cal.App.4th at pp. 815, 829.) Thus, the fuller version of the facts disclosed by the present record is not substantially different from the facts before the plaintiffs when they waived the conflict: the Trustees were clients of McCormick, and Byron was an attorney for the firm.

On the other hand, by the time of Judge Black's disclosure, plaintiffs had had an extensive opportunity to see how Judge Black was handling the trial. If they were dissatisfied, they could have taken the opportunity to have a different judge based on the facts disclosed in June of 2000. If they were not dissatisfied, the minimal additional information seems unlikely to have offset their significant financial and tactical incentives for continuing with the trial. It is far more reasonable to infer that their June decision would have been no different had plaintiffs known then what they know now. Plaintiffs have not established that additional information augmenting Judge Black's June 2000 disclosure would materially have affected plaintiffs' decision not to seek Black's disqualification thereby, at least arguably, vitiating their waiver.

## C. *The Order Conditionally Granting a New Trial*

We may now turn to plaintiffs' remaining contentions: first, that the arbitrary nature of the reduction of damages demonstrates Judge Black's actual bias and, second, that the reasons specified for the conditional grant of the new trial motion are not supported by the record. We will conclude that the reductions are supported by the evidence; they are not arbitrary and thus do not provide any evidence of actual bias on the part of Judge Black.

### 1. *The Standard of Review.*

To elaborate on our earlier statement of the standard of review of conditional grants of new trial motions: "The standards for reviewing an order granting a new trial are well settled. After authorizing trial courts to grant a new trial on the grounds of '[e]xcessive . . . damages' or '[i]nsufficiency of the evidence,' [Code of Civil Procedure] section 657 provides:. '[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence . . . or upon the ground of excessive or inadequate damages, . . . such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons.' . . . Thus, we have held that an order granting a new trial under section 657 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' [Citation.] Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . .' [Citation.] In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' [Citation.] [¶] The reason for this deference 'is that the trial court, in ruling on [a new trial] motion, sits . . . as an independent trier of fact.' [Citation.] Therefore, the trial court's factual determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations. [¶] . . . The trial court . . . is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts broad discretion to order new trials. The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons." (*Lane v. Hughes Aircraft Co.*, *supra*, 22 Cal.4th at pp. 411–412, italics omitted.)

### 2. *Economic Damages.*

As the jury was instructed, the "term economic damages means objectively verifiable monetary losses including medical expenses, loss or future loss of earnings, costs of obtaining substitute domestic services, and/or retirement benefits, loss of employment and loss of business or employment opportunities." (See BAJI No. 14.02.) The jury awarded such damages to King and Horsford in the special verdict, and the trial court granted a new trial on damages unless King and Horsford agreed to remit a portion of the jury's award.

In reducing King's award from $300,000 to $194,140, the trial court stated that the reduction reflected the court's conclusion that there was inadequate

evidence to support two components apparently incorporated into the jury's award. First was a component based on an assumption that King would have been promoted to police chief had CSUF not engaged in race discrimination. Second was a component based on increased living expenses because King's post-CSUF employment was in Oakland. The trial court's view of the evidence is reasonable.[5]

The claim that King would have been appointed chief but for race discrimination by the hiring authority was based purely on speculation.[6] Even granting full credence to the evidence that Shell discriminated against King on the basis of race, the remaining evidence nevertheless supports the trial court's conclusion that CSUF did not discriminate against King in hiring Shell's replacement. There was no evidence whatsoever of racial bias on the part of the screening committee that submitted three candidates to the hiring authority, Vice-President Quillian. King was not among those candidates and was, therefore, not eligible for consideration. Accordingly, substantial evidence initially supports the trial court's reduction of King's economic damages by $40,000. (See fn. 6, *ante*.)

The trial court was entitled to reject the claim that King suffered a loss of $66,000 as the "economic cost" of commuting to Oakland and maintaining a second home there. Plaintiffs' damages expert was entirely unconvincing on this component. For example, he testified he attributed a loss to King of $1,100 per month through King's expected retirement date, based upon the cost of a condominium King bought and immediately sold when he began living on campus for $300 per month. In addition, King's testimony concerning job opportunities closer to home, the frequency of his commute, and the nature of his expenses was all rather inconclusive. Looking at the evidence as a whole, the court reasonably concluded there was insufficient evidentiary foundation to attribute an additional $66,000 to King's economic damages as a result of the location of his new job.

---

[5] Most of plaintiffs' argument on this issue assumes the court reduced King's award because it found the evidence of lost pension benefits insufficient. While the court mentioned a concern about that factor, the order clearly specified that the reductions are based on the considerations mentioned in the text.

[6] Although the verdict did not specify the sources of plaintiffs' losses, beyond the designation as economic or noneconomic, plaintiffs acknowledge in their reply brief that the portion of King's economic damages award in excess of $260,000 apparently reflected the possibility that King could have been hired as chief. Such promotion would have resulted in an increase of King's economic damages by $202,000, according to plaintiffs' expert. The jury verdict is $40,000 greater than the expert's estimate of economic damages if King had remained a lieutenant. As there is no other ready explanation for that difference, it is reasonable to conclude the $40,000 reflects the possibility of King's promotion discounted by the uncertainty of such promotion.

The trial court's conditional grant of new trial reduced Horsford's economic damages from the jury's award of $250,000 to the amount of $98,386. The reduction was based solely upon a conclusion that the evidence did not support a "front pay" award for 10 years beyond the date of trial, as assumed by plaintiffs' damages expert. The court concluded the evidence supported an award of front pay for five and a half years from the date of Horsford's resignation from employment at CSUF in December of 1996 or, phrased differently, two years from the time of trial.

■ "Front pay," as the term is used in employment litigation, is a measure of damages for loss of future income, as opposed to backpay, which is lost-wages damages through the time of trial. Front pay usually reflects a temporary situation that will be remedied by other relief ordered in the judgment. If, for example, the court orders reinstatement of a fired employee or promotion to a job the employee was denied as a result of discrimination, front pay might be awarded to make up a wage differential if there were no vacancy into which the employee could immediately be reinstated or promoted. (See generally *Pollard v. E.I. du Pont de Nemours & Co.* (2001) 532 U.S. 843, 846–850 [150 L.Ed.2d 62, 121 S.Ct. 1946].)

Occasionally, courts have awarded front pay based upon a wage differential that will persist over the employee's working life. For example, an employee terminated from a private company that regularly paid year-end bonuses had accepted permanent employment with a government agency that did not pay bonuses; she was awarded permanent front pay. (See *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 996–997 [16 Cal.Rptr.2d 787].) There was evidence in *Bihun* that the employee planned to stay with the private employer for the rest of her career; that she still made less at the government agency after five years than she would have after her next promotion at the private employer; and that she had resigned when, after complaining of sexual harassment by a supervisor, the employer demoted her by two pay levels. (*Ibid.*)

In the present case, plaintiffs' expert assumed the differential between Horsford's CSUF earnings and his DMV earnings not only would persist for the remainder of Horsford's working life but that, in addition, the disparity would grow because he would have received step increases at CSUF and (according to what the expert said Horsford told him) no increases at all at DMV. On these bases, the expert arrived at a present-value figure of around $175,000 for Horsford's future wage loss. (The expert gave three related projections in the area of $175,000, which depended on other assumptions not relevant here.)

Noting that Horsford had himself testified that he had no intention of remaining a CSUF employee beyond the age of 50, and that the expert's

projection was based on an assumption of continuous employment through age 55, the court found there was no basis in the evidence for an award of 10 years' front pay from the time of trial—that is, until Horsford was 55.[7] The court found two additional years of lost-income damages was appropriate, based on Horsford's "relatively young age and ability to eliminate any loss of earnings going forward in addition to the fact that he left his employment with defendant voluntarily and was never out of work thereafter."[8] The court's rejection of the expert's counterfactual projection of lost income through age 55 clearly was supported by Horsford's own testimony. The court's remitted amount of economic damages, based on plaintiffs' expert's calculation of lost earnings prior to trial ($63,698) and two years of projected lost earnings after trial ($34,688) was based on a reasonable evaluation of the evidence.

### 3. *Noneconomic Damages.*

█ The correspondence between any particular sum of money and any particular instance of emotional injury is, obviously, less exact than the relationship between economic damages and the proof of lost wages. As such, the following statement by the California Supreme Court concerning damages in general is particularly germane to our discussion of the trial court's reduction of plaintiffs' noneconomic damages: "The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506–507 [15 Cal.Rptr. 161, 364 P.2d 337].)

In this case, the trial court simply concluded, from a review of the evidence, that the emotional and psychological harm to the plaintiffs was less severe than it (impliedly) appeared to the jury. In its evaluation of the evidence, the court considered that the harm was of limited duration (that is, had ended or would soon end for all three plaintiffs); that the harm had other causes in addition to the discriminatory and retaliatory conduct (e.g., litigation stress, dislike of Shell's leadership style); that the harm arose only from the adverse job actions and not from such direct psychological assaults as use of racial epithets; that the form of the adverse job actions did not result in financial distress to the plaintiffs (and was, therefore, less stressful than

---

[7] Horsford was 40 years old at the time of his departure from CSUF.

[8] Plaintiffs take exception to the court's characterization of Horsford's departure as voluntary. Nevertheless, a reasonable view of the evidence shows that he determined he would advance no further under Shell and began looking for another job. He worked at CSUF as a uniformed police officer until he was ready to start his new job as a DMV investigator.

if lack of income had added to plaintiffs' psychological burdens); and that the psychological injuries were not diagnosed as severe. The trial court's conclusion is supported by a reasonable view of the evidence.

Plaintiffs complain in various ways that the trial court's evaluation of the severity of their noneconomic harm resulted in their failure to receive "the full measure of their damages." This misses the point: the court exercised its responsibility to award plaintiffs *only* the full measure of their damages, and not a windfall unsupported by the evidence. Approaching the issue from a different direction, plaintiffs contend the court only addressed the evidence that minimized the damages and "completely ignored" the evidence of harm. This critique might have merit if the court had remitted all of the noneconomic damages. But the court did not do that; instead, it found that there was substantial evidence—undoubtedly the very evidence plaintiffs complain was ignored—to support an award of noneconomic damages of $300,000 to Horsford, $250,000 to Snow, and $275,000 to King. The court did not abuse its discretion.

### III. Plaintiffs' Appeal from Denial of Injunction

#### A. Standard of Review

■ "A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate." (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646 [4 Cal.Rptr.2d 689].) The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion. (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 [117 Cal.Rptr.2d 631].) The exercise of discretion must be supported by the evidence and, "to the extent the trial court had to review the evidence to resolve disputed factual issues, and draw inferences from the presented facts, [we] review such factual findings under a substantial evidence standard." (*Ibid.*) We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order. (*Cabrini Villas Homeowners Assn. v. Haghverdian* (2003) 111 Cal.App.4th 683, 688–689 [4 Cal.Rptr.3d 192].)

The parties agree that the FEHA permits injunctive relief for discriminatory employment practices. Plaintiffs, however, in asserting that the trial court abused its discretion in denying injunctive relief here, offer a version of facts at odds with the substantial evidence standard of review. After consideration of the record in the light most favorable to the trial court's decision, we conclude plaintiffs have not established that the trial court abused its discretion.

B. *The Pleadings and the Court's Order*

Plaintiffs' complaint sought injunctive relief requiring CSUF to grant or restore to them, as individuals, certain employment benefits. After trial, however, plaintiffs moved the court for an order seeking not only that relief but also seeking broadly to prohibit any hiring or other employment practice by CSUF, a public employer, "in which the race, color, religion, national origin, sex, sexual preference, marital status, pregnancy, age, disability, and/or veteran's status of any applicant for employment or promotion may be considered as a factor" in violation of article 1, sections 8 and 31 of the California Constitution.

By written order of December 7, 2000, the court denied plaintiffs' application for injunctive relief. The court denied reconsideration of that order.

On appeal, plaintiffs challenge only the portion of the order denying the broad injunction against hiring and employment practices that violate the California Constitution. Accordingly, our summary of the court's order will address only the findings related to that denial.

The court first noted that the question of broad injunctive relief had not been raised during the trial and, as a result, "little, if any, evidence was either offered or received with regard to, among other issues, whether, even assuming discrimination occurred as to plaintiffs, it continues." The court added that "the vast majority of the evidence" concerned the individual actions of Shell, who was no longer employed by CSUF: "Evidence of racial or color discrimination by other employees of defendant was insignificant or non-existent." Finally, as to the university's affirmative action policy, "plaintiffs did not prove by a preponderance of the evidence that it was ever implemented and no evidence was presented which would tend to indicate that its implementation is imminent or even contemplated." (We note that there was no evidence whatsoever concerning the other bases, apart from race, for employment preferences listed in plaintiffs' application for injunctive relief.) The court concluded that there had been no adequate showing that discrimination would occur in the absence of injunctive relief.

C. *Analysis*

Proposition 209, adding article 1, section 31 of the California Constitution, was a approved by the voters on November 5, 1996.[9]

---

[9] California Constitution, article I, section 31, provides:

"(a) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

Plaintiffs did not assert broad injunctive relief as an issue during the trial and no evidence was brought to bear on the details of CSUF's affirmative action practices after the adoption of Proposition 209 in 1996. The record before the trial court at the time of the injunction hearing was insufficient to permit—much less require—the trial court to infer that CSUF had completely ignored the approval of Proposition 209.

The only evidence concerning CSUF's affirmative action plan and the instances in which race may have been a factor in preferential hiring consisted of the testimony of Nita Kobe, a retired executive in the CSUF human resources department. She testified that minority status "did play a role at times" in the selection between two equally qualified candidates for employment. She could not think of a specific example, however. Kobe testified that she retired from CSUF in 1996.

Plaintiffs claim there was evidence that other officials in the CSUF administration knew that Shell was giving preferential treatment to minorities in the hiring process. Shell left CSUF in 1997, however.

At the time of trial (and at the time of the injunction hearing) the scope of Proposition 209 was still somewhat uncertain. (See *Lungren v. Superior Court* (1996) 48 Cal.App.4th 435, 441–442 [55 Cal.Rptr.2d 690].) It was only between the injunction hearing and the trial court's ruling that the Supreme Court first considered Proposition 209 in *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537 [101 Cal.Rptr.2d 653, 12 P.3d 1068]. It was not until after the application for injunction was denied and this case was

---

"(b) This section shall apply only to action taken after the section's effective date.

"(c) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex which are reasonably necessary to the normal operation of public employment, public education, or public contracting.

"(d) Nothing in this section shall be interpreted as invalidating any court order or consent decree which is in force as of the effective date of this section.

"(e) Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the state.

"(f) For the purposes of this section, 'state' shall include, but not necessarily be limited to, the state itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the state.

"(g) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national origin, as are otherwise available for violations of then-existing California antidiscrimination law.

"(h) This section shall be self-executing. If any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section."

on appeal that an affirmative action plan similar to that of CSUF was invalidated, in part (but only in part), as conflicting with Proposition 209. (See *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 53–61 [112 Cal.Rptr.2d 5].) Thus, the trial court could not simply take Kobe's vague testimony about hiring practices before Proposition 209 and infer that CSUF's policy and practice at the time of the injunction hearing in all respects violated Proposition 209; the matter was far more complex, and the record was wholly insufficient to sustain any kind of complex inquiry into current practices. The trial court did not abuse its discretion in denying plaintiffs' application for injunctive relief.

## IV.   The Attorney Fees Appeal

The FEHA provides that the trial court, "in its discretion, may award to the prevailing party reasonable attorney's fees and costs . . . ." (Gov. Code, § 12965, subd. (b).) An appellate court may reverse a trial court decision concerning an award of attorney fees only upon a finding of a prejudicial abuse of discretion. (See *Baggett v. Gates* (1982) 32 Cal.3d 128, 142–143 [185 Cal.Rptr. 232, 649 P.2d 874].)

It is often said that a trial court's exercise of discretion will be reversed only if its decision is "beyond the bounds of reason." (See, e.g., *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478 [243 Cal.Rptr. 902, 749 P.2d 339].) This description of the standard is complete, however, only if "beyond the bounds of reason" is understood as something in addition to simply "irrational" or "illogical." While an irrational decision would usually constitute an abuse of discretion, the legal standard of review encompasses more than that: "The scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704].) For example, a court could be mistaken about the scope of its discretion and the mistake could be entirely "reasonable"—that is, it adopts a position about which reasonable judges could differ. But a reasoned decision based on the reasonable view of the scope of discretion is still an abuse of judicial discretion when it starts from a mistaken premise, even though nothing about the exercise of discretion is, in ordinary-language use of the phrase, "beyond the bounds of reason." (See *id.* at p. 1298.) In other words, judicial discretion must be measured against the general rules of law and, in the case of a statutory grant of discretion, against the specific law that grants the discretion. (*County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771, 1778 [25 Cal.Rptr.2d 681]; *Board of Administration v.*

*Wilson* (1997) 57 Cal.App.4th 967, 973 [67 Cal.Rptr.2d 477]; see also *Blanchard v. Bergeron* (1989) 489 U.S. 87, 89, fn. 1 [103 L.Ed.2d 67, 109 S.Ct. 939].)

"In its discretion," therefore, is not the equivalent of "if it wants to" or "if it feels like it." Instead, in the context of the grant of discretion in Government Code section 12965, subdivision (b), it means something akin to the italicized portion of the following: "the court, [*in a manner that, in the judgment of the court, will best effectuate the purposes of FEHA*], may award to the prevailing party reasonable attorney's fees and costs."

"The basic, underlying purpose of FEHA is to safeguard the right of Californians to seek, obtain, and hold employment without experiencing discrimination" on account of, inter alia, race or color. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 582–583 [110 Cal.Rptr.2d 809, 28 P.3d 860].) " ' "[W]ithout some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." ' " (*Id.* at p. 583, quoting *Baggett v. Gates, supra*, 32 Cal.3d at p. 142.) The award of reasonable attorney fees accomplishes "the Legislature's expressly stated purpose of FEHA 'to provide effective remedies that will eliminate these discriminatory practices.' (Gov. Code, § 12920.)" (*Flannery v. Prentice, supra,* at p. 583.)

In order to be effective in accomplishing the legislative purpose of assuring the availability of counsel to bring meritorious actions under FEHA, the goal of an award of attorney fees "is to fix a fee at the fair market value for the particular action." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 [104 Cal.Rptr.2d 377, 17 P.3d 735].) "[F]ee awards should be fully compensatory." (*Id.* at p. 1133.) "[A]bsent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for *all* the hours *reasonably spent*" in litigating the action to a successful conclusion. (*Ibid.*, italics in original.) "Reasonably spent" means that time spent "in the form of inefficient or duplicative efforts is not subject to compensation." (*Id.* at p. 1132.)

While the trial court has discretion to increase or decrease the ultimate award in order to effectuate the purposes of FEHA and to ensure a fair and just result, the court is required to begin by determining "*all* the hours *reasonably spent*" and multiplying that total by "the hourly prevailing rate for private attorneys in the community conducting *noncontingent* litigation of the same type." (*Ketchum v. Moses, supra,* 24 Cal.4th at p. 1133, italics in original.) The resulting sum is called the "lodestar." (*Ibid.*)

It has long been recognized, however, that the contingent and deferred nature of the fee award in a civil rights or other case with statutory

attorney fees requires that the fee be adjusted in some manner to reflect the fact that the fair market value of legal services provided on that basis is greater than the equivalent noncontingent hourly rate. (*Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1132–1133.) " 'A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.' " (*Id.* at p. 1133, quoting with approval from Leubsdorf, *The Contingency Factor in Attorney Fee Awards* (1981) 90 Yale L.J. 473, 480.) The contingency adjustment may be made at the lodestar phase of the court's calculation or by applying a multiplier to the noncontingency lodestar calculation (but not both). (*Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1133–1134.)

We defer for the moment the other factors the court may consider in adjusting the fee and pause here to summarize the first part of this discussion: In our view, the Supreme Court clearly has indicated that the court's discretion in awarding attorney fees is, initially ("absent circumstances rendering the award unjust"), to be exercised so as to fully compensate counsel for the prevailing party for services reasonably provided to his or her client. The basis for the trial court's calculation must be the actual hours counsel has devoted to the case, less those that result from inefficient or duplicative use of time. (See *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1133.) Then the court must adjust the resulting fee to fulfill the statutory purpose of bringing "the financial incentives for attorneys enforcing important constitutional rights . . . into line with incentives they have to undertake claims for which they are paid on a fee-for-service basis." (*Id.* at p. 1132.)

In contrast to the foregoing standards, the trial court here articulated a different basis for its calculation of fees: "I just want to be clear on what the standard is. It's not necessarily adequate compensation. It's reasonable attorneys' fees." Further, in its order denying rehearing on the fee issue, the court stated: "[T]he court has serious concerns about the efficiency with which the case was handled and the time entries reflected in the time records. *Although the court could have denied the [fee] motion entirely,* it chose to award what in its estimation was a reasonable fee." (Italics added.)

It does not appear, from a review of the record of the fee award hearings, that the trial court undertook its review of the fee issue with a focus on providing an award of attorney fees reasonably designed to fully compensate plaintiffs' attorneys for the services provided. Nor did the trial court make a finding that full compensation would be unjust in the circumstances of this

case. Accordingly, we conclude the court did not exercise its judicial discretion in the framework of the statute granting that discretion; as a result there was an abuse of discretion. (See *City of Sacramento v. Drew, supra,* 207 Cal.App.3d at p. 1297.)

Although we must reverse the order awarding attorney fees on the basis the court failed generally to exercise its judicial discretion to accomplish the purposes of the law granting such discretion, we also discuss four particular aspects of the fee award in which the court abused its discretion. On remand, each of these aspects of the award must be reexamined in light of the purposes of Government Code section 12965, subdivision (b).

First, the trial court found the extensive time records submitted by plaintiffs' counsel in verified declarations "were not a hundred percent reliable" and were "less than completely reliable." The court pointed to several specific instances in which it appeared all three attorneys had billed for reviewing the same discovery request from defendants; the court stated generally that there were many such instances. As a result, "the billing records of plaintiffs' counsel [were] given little weight." In addition, the court determined that it was not "necessary" that plaintiffs have three attorneys present for much of the trial and two attorneys for many of the depositions. The court then determined that, because the time records were not "a hundred percent reliable," the court was "left . . . having to arrive at the attorneys' fees in another way." The court explained that it reached "the lodestar amount by giving due consideration to all of the pleadings and argument of counsel regarding the issue, and based upon the entire course of the litigation, including pre-trial matters, discovery, litigation tactics, and the trial itself."[10]

The trial court abused its discretion in rejecting wholesale counsels' verified time records. We think the verified time statements of the attorneys, as officers of the court, are entitled to credence in the absence of a clear indication the records are erroneous. Attorney Gordon, for example, stated in his verified declaration that his listing of hours "included only the hours that I believe were reasonably necessary to achieve our clients' goals."

Instead of a presumption of credibility, the trial court often assumed the opposite. In one instance, the court noted that Murray recorded two hours for reading an opposition to a motion for protective order (29 pages) and preparation of notes for discussion with Gordon and Johnson. The next day, Gordon billed three and a half hours for review and research concerning the

---

[10] In addition to the contested portion of the attorney fees awarded, the court granted in full the fee request with respect to other lawyers who played a supporting role in the litigation, in the total amount of $382,764.50. The appeal does not raise issues about that aspect of the award.

opposition. That same day, Johnson recorded two and a half hours for reviewing and editing "opp. To mtn for prot. Order 18 pg." The court determined that this was "billing[] for overlapping work." It is not at all unreasonable, however, to interpret this sequence of time records as reflecting completely ordinary practice in a law firm handling a case of this magnitude: The opposition points and authorities are delivered to the senior partner, who reviews the document and makes notes for a meeting with his subordinates. At that meeting, he or she assigns one attorney to research and draft a reply to the opposition and a third attorney to edit and cite check the reply before it goes out. The total time billed for review of the 29-page opposition and preparation of the 18-page reply is eight hours. (Murray's fee declaration indicates this type of supervision structure within the plaintiffs' litigation team, and stated there were "a vast number [of acts] which I have not shown time for but which I have participated in.") Additionally, the amount of time billed is not presumptively unreasonable in light of the plaintiff team of attorneys maintaining offices at separate locations and representing not one but three separate party plaintiffs.

If eight hours for preparing the reply memorandum is excessive, it is not excessive by much. The eight-hour total might have been reduced through an exercise of the trial court's discretion—but the court did not exercise its discretion to do so. Instead, it used its negative interpretation of the records as a basis for disregarding the time records completely. There was no basis inherent in this series of records for the court's negative interpretation of them, much less a basis for disregarding them completely. Further, the fact there are "numerous other" instances of such "overlapping work" does not add a rationale for completely disregarding the verified time records.

We conclude the trial court abused its discretion in failing to use counsels' time records as the starting point for its lodestar determination. (*Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1132–1133.) The court's expressed reasons for departing from this "ordinary" method of calculating the lodestar amount do not support a conclusion that reliance on the records would lead to an unjust result. (See *ibid.*)

Second, the court erred in failing adequately to consider the propriety of a higher hourly rate for Murray, a San Francisco attorney, in order to accomplish the purposes of FEHA. The issue here arises from the language of the Supreme Court's usual formulation of the lodestar standard: "the lodestar is the basic fee for comparable legal services *in the community*." (*Ketchum v. Moses, supra,* 24 Cal.4th at p. 1132, italics added.) The trial court took this as a directive that only fees prevailing in the place of trial provided a proper basis for determining fees or, in the alternative, that plaintiffs had not established the need for out-of-town counsel.

In the present case, Horsford submitted a declaration stating that he tried to find local counsel and was wholly unsuccessful: "I first contacted attorney[] Barry Bennett, who specializes in labor and employment law, and he told me that he would not be able to represent me. [¶] I then attempted to obtain an attorney by calling various attorneys listed in the Fresno Yellow Pages as practicing labor and employment law. I spoke with about six different attorneys who represented employees. . . . All of them appeared to be apprehensive to take my case, and they all declined to represent me. Finally, a friend gave me the name of Larry Murray, an attorney in the San Francisco area."

By contrast, the trial court concluded "there is no adequate showing that it was impossible or even unusually difficult to find a local attorney to take the case particularly in view of the fact that plaintiffs did, in fact, find not one, but two, qualified local attorneys to represent them who are now seeking compensation [sic]." This conclusion simply disregards the record. Plaintiffs never found local attorneys to represent them. To the contrary, Murray located Gordon and Johnson to serve as local counsel only after a great deal of difficulty. Several local civil rights lawyers submitted declaration stating that they had turned down Murray's request to serve as local counsel. Another local lawyer submitted a declaration that he declined Murray's request because his firm had represented CSUF.

Even Gordon stated in his declaration that he originally agreed only "to make some appearances and do deposition work" as local counsel in the case, at the urging of another local lawyer who told him Murray was having great difficulty even finding local counsel "in any case against [CSUF], apparently because many of them either had familial ties with CSUF or feared the adverse effect on their practice such participation might engender due to the popularity of Fresno State and the Bulldog athletic teams." Gordon stated: "Had I known how time-consuming, and how costly emotionally and finan-cially this case was going to be, I would have declined Mr. Murray's invitation to join with him."

Murray was able to obtain local assistance on a limited basis, but the exigencies of the case soon forced local counsel to become heavily involved in the case. Nevertheless, it was Murray who carried the litigation costs (which ultimately totaled more than $100,000), the anticipated size of which had been a further impediment to plaintiffs in seeking local counsel in the first place.

This evidence was overwhelming and uncontradicted; it simply provides no basis for the court's conclusion that "there is no adequate showing that it was impossible or even unusually difficult to find a local attorney to take the

case." While we doubt a plaintiff needs to make anything more than "a good-faith effort to find local counsel" (*Mathur v. Bd. of Trustees of Southern Il. Univ.* (7th Cir. 2003) 317 F.3d 738, 744) in order to justify the fees of out-of-town counsel, the evidence in the present case satisfies even the higher standard adopted by the trial court.

As noted, the Supreme Court has used the formulation "basic fee for comparable legal services in the community." However, it has never hinted that, in the unusual circumstance that local counsel is unavailable, the trial court is limited to the use of local hourly rates. The purpose of statutory attorney fee provisions is to provide financial incentives necessary for the private enforcement of important civil rights. (*Ketchum v. Moses, supra,* 24 Cal.4th at p. 1132.) If a potential defendant is too intimidating to the local bar or so replete with resources as to potentially overwhelm local counsel, or if the local plaintiffs' bar has not the resources to engage in complex litigation on a contingency-fee basis, the public interest in the prosecution of meritorious civil rights cases requires that the financial incentives be adjusted to attract attorneys who are sufficient to the cause. In the absence of any realistic indication plaintiffs could have found local counsel, it was an abuse of discretion to fail even to consider an hourly rate based on counsel's "home" market rate.

The method of achieving adequate compensation for out-of-town counsel, when reasonably necessary, rests within the trial court's discretion. If all lawyers for the prevailing party are from the high-fee area, the court might consider that factor in determining whether to award an enhancement multiplier to a lodestar initially calculated using local hourly rates. In cases like the present, where only some attorneys are from the high-fee area, the court should consider making the adjustment for the hourly rate of that attorney, rather than adjusting upward all of the fees through a multiplier, which might unjustly compensate the local attorneys. In any event, the policies of the FEHA attorney fees provision require that the court consider awarding market value compensation for an attorney who is from a higher fee market, if the plaintiffs demonstrate, as they did here, that hiring local counsel was impracticable.

Third, the trial court abused its discretion in failing to consider the relevant factors for awarding an enhancement multiplier. In particular, as reiterated by the Supreme Court in *Ketchum v. Moses, supra,* 24 Cal.4th at pages 1132–1134, the market value of the services provided by plaintiffs' counsel in a case of this magnitude must take into consideration that any compensation has been deferred for up to four years from the time an hourly fee attorney would begin collecting fees from his or her client; that the demands of the present case substantially precluded other work during that extended period,

which makes the ultimate risk of not obtaining fees all the greater (since the attorneys must use savings or incur debt to keep their offices afloat and their families fed during the years-long litigation); and that a failure to fully compensate for the enormous risk in bringing even a wholly meritorious case would effectively immunize large or politically powerful defendants from being held to answer for constitutional deprivations, resulting in harm to the public. (We refer to these factors below as "contingency and delay" factors.[11])

Further, the trial court's reliance on the public-entity status of the defendant to completely deny an enhancement multiplier in this case was an abuse of discretion. Although the Supreme Court in *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303], approved a trial court's use of this factor in determining the amount of fees, the *Serrano* court did not say and has not said that a public entity should not fully compensate plaintiffs' attorneys when litigation has been necessary to remedy intentional race discrimination by the public entity. *Serrano*, for example, dealt not with intentional discrimination by the defendants but, rather, with the constitutional validity of the statutory scheme for funding school districts, over which the defendants had no control and, as a practical matter, had to defend whether they wanted to or not. (See *id.* at p. 31.) Under those circumstances, the Supreme Court held that it was not an abuse of discretion to consider the taxpayers' interest in arriving at reasonable attorney fees. This factor is far less important, however, where the public entity intentionally engages in

---

[11] The use of the term "contingency" in statutory attorney fee discussions can be somewhat misleading. As case law has long recognized, counsel for a victorious plaintiff in a civil rights action will normally have a right to statutory attorney fees. (See, e.g., *Newman v. Piggie Park Enterprises, Inc.* (1968) 390 U.S. 400, 402 [19 L.Ed.2d 1263, 88 S.Ct. 964].) And that fee will not be limited, as in a traditional tort contingency fee case, by the amount of the plaintiff's recovery. (See *Blanchard v. Bergeron, supra,* 489 U.S. at p. 96.) In that sense, it is possible to state, as the trial court did here, that fees do not depend upon the percentage contingency at all, but are practically guaranteed to counsel for hourly work performed for a successful civil rights plaintiff. And looking at the matter from that vantage point permits a court to state, as did the trial court here (citing *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1174–1175 [74 Cal.Rptr.2d 510]), that the certainty of fee awards in civil rights cases can lead to attorneys taking cases "of dubious merit from either an individual or public policy point of view," with a result that "there is no shortage of the number of such cases which are filed, some of which are meritorious and some of which are not."

But that is not the sense in which the contingent nature of civil rights attorney fees was discussed in the cases and scholarly writings summarized in *Ketchum v. Moses, supra,* 24 Cal.4th at pages 1132–1133. There, of course, the focus is on the fact that litigation is fraught with uncertainty and even the most scrupulous attorney will "win some and lose some," as the saying goes. And settlement offers, such as the one plaintiffs rejected in the present case, will often be lump-sum offers, without separately providing for attorney fees, so counsel is then left to obtain payment under a traditional tort case contingency fee. Accordingly, the "contingency" factors summarized in *Ketchum* assume as a premise that statutory attorney fees are semiguaranteed after a plaintiff prevails, but that there is, nevertheless, a great element of contingency in any fee system that rewards only attorneys for prevailing parties.

discrimination and chooses to defend its conduct through lengthy and complex litigation. And in neither event is a trial court permitted to use the "public entity" factor to wholly negate the enhancement of a lodestar that otherwise would be appropriate after consideration of the contingency and delay factors.

Fourth, and finally, the trial court abused its discretion in requiring plaintiffs' counsel to look to their clients, under a contingency fee agreement, to make up for any undercompensation arising from the court's statutory fee award. While the Trustees dispute that the trial court did this, they agree requiring this of plaintiffs' counsel would be improper. We think it clear that the court did require counsel to look to plaintiffs for full compensation.

The trial court impliedly agreed that an enhancement multiplier would be appropriate in this case because of the contingency and delay factors. However, the court's attorney fee order then states: "[L]ike all successful plaintiffs' counsel working on a contingency case, [they] would . . . be entitled to a contractual percentage of the recovery if they were not to waive it. Such a recovery, on top of a statutory fee award under the lodestar methodology, <u>does</u> provide a sufficient incentive for the pursuit by high caliber lawyers of claims such as were presented in this case and, as a result, there is no shortage of the number of such cases which are filed, some of which are meritorious and some of which are not."

The trial court appears to be saying that the availability of contingency fees from the plaintiff displaces the considerations of contingency and delay that are required to be factored in to a fee award to make it "reasonable" under the standards reviewed in *Ketchum v. Moses, supra,* 24 Cal.4th at pages 1132–1134. Yet, as respondent acknowledges, plaintiffs' counsel are not permitted to take contractual fees in addition to statutory fees: If the contingency fee is *larger* than the statutory fee award, counsel is permitted to accept that fee, with a setoff for statutory fees received. If the contingency fee is smaller than the statutory fee, counsel must reimburse the plaintiff from the statutory award for any amounts already paid by the client pursuant to the contingency contract. (See *Blanchard v. Bergeron, supra,* 489 U.S. at p. 93; *Flannery v. Prentice, supra,* 26 Cal.4th at p. 577.)

Accordingly, to displace the contingency and delay considerations from the fee calculus, and replace those considerations with hypothetical fees that counsel are prohibited from obtaining, is an abuse of the court's discretion to determine reasonable attorney fees under Government Code section 12965, subdivision (b).

## DISPOSITION

The judgment on the merits is affirmed. The order for attorney fees is reversed and remanded for further proceedings consistent with the views expressed in this opinion. Plaintiffs are awarded costs on appeal and attorney fees in an amount to be determined by the trial court, limited to representation of respondents in the Trustees' appeal and in plaintiffs' attorney fee appeal.

Wiseman, J., and Levy, J., concurred.

A petition for a rehearing was denied September 22, 2005, and the petition of defendant and appellant for review by the Supreme Court was denied November 16, 2005.