Filed 4/18/14  Smith v. Esmailzadeh CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| DWIGHT SMITH et al., | B239828 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. SC 091967) |
| v. | |
| ROUHOLLAH ESMAILZADEH et al., | ORDER MODIFYING OPINION |
| Defendants and Appellants, | NO CHANGE IN JUDGMENT |
| ALBERT MIKAELIAN et al., | |
| Defendants and Respondents. | |

THE COURT:[*]

IT IS HEREBY ORDERED that the opinion filed herein on March 19, 2014, be modified as follows:

1.  On page 7, second paragraph, delete the last sentence that begins, "Where the pipe penetrated . . ." and replace that sentence with the following sentence:

Where the pipe exited through the wall on the Smiths' property, there was no wrapping between the pipe and concrete.

2.  On page 16, first paragraph, delete the fourth sentence that begins, "Moreover, the evidence demonstrated . . ." and replace that sentence with the following sentence:

Moreover, the evidence demonstrated that in the event of an earthquake, the pipe could be damaged and require excavation, especially because (1) it was encased in concrete where it exited the wall from the Smiths' property onto the Esmailzadehs' property, and the movement of the concrete would make the pipe more vulnerable to rupture, and (2) the additional earth covering the pipe on the Esmailzadehs' property increased the pressure on the pipe and therefore increased the likelihood of it breaking in an earthquake.

3. On page 18, first paragraph, delete the second sentence that begins, "The pipe was . . ." and replace it with the following sentence:

The pipe was somewhere around three to four feet underground on the Smiths' property, while it was seven to eight feet underground at points on the Esmailzadehs' side.

There is no change in judgment.

The Esmailzadehs' petition for rehearing is denied.

Filed 3/19/14  Smith v. Esmailzadeh CA2/8 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| DWIGHT SMITH et al., | B239828 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. SC 091967) |
| v. | |
| ROUHOLLAH ESMAILZADEH et al., | |
| Defendants and Appellants, | |
| ALBERT MIKAELIAN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Norman P. Tarle, Judge.  Affirmed with modifications.

Skapik Law Group and Mark J. Skapik for Plaintiffs and Appellants.

Northrup Schuleter, Linda L. Northrup and Mikita A. Weaver for Defendants and Appellants Rouhollah and Parvin Esmailzadeh and the Esmailzadeh Family Trust.

Chapman, Glucksman, Dean, Roeb & Barger, Arthur J. Chapman, Thomas L. Halliwell and Marsha L. Kempson for Defendants and Respondents Albert Mikaelian, Raoul Cardinale, and Task Construction, Inc.

\* \* \* \* \* \*

Dwight and Claire Smith (Smiths) sued Rouhollah and Parvin Esmailzadeh individually and as trustees of the Rouhollah and Parvin Esmailzadeh Family Trust (Esmailzadehs) to resolve a dispute concerning a sewer easement. The Smiths and the Esmailzadehs own single-family properties next to each other. The sewer pipe to which the easement pertains belongs to the Smiths and runs from the Smiths' property to the Esmailzadehs' property. After a phase one trial on equitable issues, the court extinguished the express easement and replaced it with an equitable easement. The court also entered an injunction ordering the Esmailzadehs to remove certain obstructions on their land that impeded the Smiths access to their sewer pipe. After a phase two trial on issues at law, the court entered judgment and denied the Smiths' motion for attorney fees. It also ordered the Smiths to pay the Esmailzadehs' attorney fees. The court based its attorney fee award on the fact that the Esmailzadehs made a pretrial offer to compromise pursuant to Code of Civil Procedure Section 998.[1]

The Esmailzadehs contend the court erred in ordering them to remove the obstructions over the sewer pipe. We agree to the extent the court ordered them to remove trees planted within the easement, but we disagree to the extent the court ordered the other obstructions removed. We therefore modify and affirm the modified judgment.

The Smiths contend the court erred in denying their attorney fees and awarding the Esmailzadehs their attorney fees. We disagree and affirm the court's attorney fees orders.[2]

**FACTS AND PROCEDURE**

The Smiths own real property at 8 Oakmont Drive in the Brentwood Park area of Los Angeles. The Esmailzadehs own the adjacent real property at 6 Oakmont Drive.

---

[1]     Further undesignated statutory references are to the Code of Civil Procedure.

[2]     The Esmailzadehs have requested that we judicially notice state bar records showing the background and legal education of the Smiths' trial counsel. We deny the request for judicial notice, as the records are unnecessary for our resolution of this appeal.

2

The Smiths' property connects to the Los Angeles City public sewer system through an underground pipe that runs from the Smiths' property and then crosses into the Esmailzadehs' property and traverses the northeasterly boundary of the property. The Smiths' predecessors-in-interest acquired an easement for the sewer pipe from the Esmailzadehs' predecessors-in-interest. The easement was set forth in a conveyance dated October 26, 1987, and recorded in December 1987. The "grant of easement" provided for "a four foot (4') wide private sewer easement . . . and an eight inch (8") main line sewer" located along "the northeasterly four (4.00) feet of" the back property line of 6 Oakmont Drive, which location the grant further described in detail. The grant of easement also provided for reasonable access to clean the sewer pipe every 100 feet, a check valve to be installed and maintained by the grantees, and a service contract to be obtained by the grantees for the cleaning of the sewer pipe at least once a year. The easement "include[d] all incidental rights of maintenance and the obligation to repair and replace, as needed."

The grant of easement contained an attorney fees provision stating that "[i]n the event of any controversy, claim or dispute relating to this instrument or the breach thereof, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorney fees and costs."

The Smiths' operative complaint, the first amended complaint (FAC), alleged equitable causes of action to enjoin the Esmailzadehs from developing their property and building new construction; to quiet title to the sewer easement in the Smiths; and to obtain a declaration that the sewer pipe be moved to the location described in the easement, because the Esmailzadehs had allegedly moved the pipe outside the easement during their construction. The FAC also alleged causes of action at law for trespass, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. These causes of action alleged the Esmailzadehs and their contractors had trespassed the sewer easement and damaged the sewer pipe, and furthermore, their actions had caused an alleged backup of effluent in the Smiths' sewer line that resulted in personal injuries and emotional distress to the Smiths. The contractors named in the FAC

3

are Task Construction, Inc., Albert Mikaelian, Raoul Cardinale, Architecture West, Charles Slater, and Kirk Darnell, individually and doing business as Darnell Construction.**3**

The Esmailzadehs filed a second amended cross-complaint for breach of contract, reformation of the easement, declaratory relief, unjust enrichment, and nuisance. They alleged the Smiths breached the grant of easement by failing to comply with the maintenance provisions. Further, they contended the grant of easement did not accurately describe the location of the sewer pipe because of a mutual mistake, and they wanted the easement reformed to describe the pipe's current location. Alternatively, they wanted a declaration that the Smiths' breach of the terms of the easement rendered the easement null and void. They also claimed the Smiths had been unjustly enriched in the sum of $25,000 when the Esmailzadehs repaired and replaced the portion of the sewer pipe that ran under the Esmailzadehs' property. Finally, they contended the Smiths had created a nuisance by diverting water onto their property and allowing branches and roots to encroach onto their property.

After a motion by the Smiths, the court bifurcated trial so that it would first try the equitable causes of action and issues in the FAC and operative cross-complaint. These issues "involve[d] the alleged existence, title, extinguishment, location and/or re-location of the easement." Any issues concerning damages or indemnity were to be tried in the second phase.

Before the first phase of trial, the Smiths dismissed the contractor defendants from their equitable causes of action but not their legal causes of action. The court ruled the contractor defendants could nevertheless participate in the phase one trial because there would likely be some overlap in evidence between phase one and phase two.

---

**3** We occasionally refer to all defendants except the Esmailzadehs as the "contractor defendants," and Task Construction, Inc., Albert Mikaelian, and Raoul Cardinale as the "Task defendants."

4

The Esmailzadehs, the Task defendants, and Architecture West made an offer to compromise pursuant to section 998 (998 offer) prior to trial. In it, they offered to allow a judgment against them providing: (1) the easement would be modified and confirmed pursuant to a survey paid for by the offering defendants, so that it would be a four-foot wide easement in the pipe's current location; (2) the check valve requirement would be eliminated, but the Smiths would assume all future liability for any damages a check valve would have prevented; (3) the pipe size would be changed from eight inches to four inches in diameter; (4) the offering defendants would pay to excavate and reinstall a new code-compliant pipe in substantially the same location; (5) the offering defendants would pay $350,000 in damages to the Smiths; and (6) all claims of the Smiths and cross-claims of the Esmailzadehs, to the extent they were not resolved by the offered judgment, would be dismissed with prejudice. The Smiths did not accept the 998 offer, and the court held the phase one trial on equitable issues from April 13 through 28, 2009. We summarize the pertinent phase one trial evidence in the following part.

## 1. *Phase One Trial Evidence*

Mr. Smith purchased the Smiths' property in 1992. The Esmailzadehs purchased their property in 2003. In approximately April 2005, the Esmailzadehs demolished the existing single-family residence on their property and prepared to construct a new residence there. Mr. Smith learned the Esmailzadehs were doing construction work on their property around the same time in 2005. He first learned his sewer pipe went across the back of the Esmailzadehs' property pursuant to an easement when the pipe became blocked in November 2006. Between 1992 and November 2006, Mr. Smith never did anything to modify his sewer lines or plumbing. He also did not provide for annual cleaning of the portion of the sewer pipe in the easement. But he had a plumber check his sewer lines every year since 1992 while the plumber was performing maintenance on his household plumbing. The plumber could tell him whether the sewer lines were clear from the pressure when the toilets were flushed.

During the summer of 2005, a subcontractor of the Esmailzadehs' contractor repaired the subject sewer pipe when it was damaged during construction. When the

subcontractor excavated the pipe, it was approximately two and a half to three feet underground. The subcontractor replaced approximately 40 feet of pipe. The subcontractor explained that excavating on this project was more expensive than usual because it had to be done by hand and not with automated equipment.

From approximately August 2005 to November 2006, the Smiths' toilets and other plumbing were not functioning normally, and there was a slight foul odor in the house, the source of which they could not pinpoint. At some point during this period between August 2005 and November 2006, Mrs. Smith suggested that perhaps the construction next door was causing their plumbing problems. The Smiths investigated that possibility around November 2006. At that time, they were experiencing almost a complete stoppage in the plumbing of their house in that the drains were taking a very long time to drain, and they called their plumber to investigate. They discovered there was a blockage in the sewer pipe in the portion that ran under the Esmailzadehs' property. At this point, construction on the Esmailzadehs' home had progressed so that the contractor had completed retaining walls and grading in their backyard, had built the foundation and framing for the house, and was in the midst of installing plumbing and electrical in the house.

A crew working on behalf of the Esmailzadehs' contractor excavated and disassembled the Smiths' sewer pipe and removed a rock from it. The whole process from excavation and removal of the rock to reassembly of the pipe was completed within one day. The crew also ran a video snake through the pipe several days later to determine that there was nothing else blocking the pipe. The crew ran the snake through the entire length of the pipe under the Esmailzadehs' property. Since the crew removed the rock from the sewer pipe, the Smiths' plumbing has functioned fine.[4]

---

[4] The Smiths filed their complaint in December 2006, shortly after this incident with the blocked pipe in November 2006.

The Smiths' expert, Edward Saltzberg, is a forensic mechanical engineer who specializes in plumbing design and engineering. He testified the most important considerations in designing a sewer system within an easement were accessibility and maintenance. Saltzberg had "serious concerns" about the life expectancy of a pipe embedded in concrete without any other wrapping around the pipe. This was because any movement of the concrete, such as an earthquake or any sort of settlement, would rupture the pipe. Also, to repair the ruptured pipe would be costly because workers would have to chip out the concrete, and it would be difficult to chip out the concrete effectively.

On or about March 5, 2009, when Saltzberg observed work being done at the Esmailzadehs' property, he saw that concrete encased the subject sewer pipe in both locations where the crew was excavating. The crew had excavated the pipe where it came through the retaining wall between the Smiths' and Esmailzadehs' property, and again where the pipe left the Esmailzadehs' property. Where the pipe penetrated through the walls on the Smiths' and Esmailzadehs' properties, there was no wrapping between the pipe and concrete.

Both excavation trenches were approximately seven and a half to eight feet deep. The crew spent nearly all day digging those trenches. If the sewer pipe had been two feet underground as opposed to seven and a half feet, the crew could have excavated it in an hour to an hour and a half. Also, the trenches were deep enough to require plywood shoring so that the walls of the trench did not collapse and bury workers who might be standing in the trench. If only two feet of dirt had covered the pipe, the trenches would not have required shoring. The deep trenches also required workers to get into them and pass buckets full of dirt up as they were digging, which again would not have been required if the trenches were only two feet deep. On the Smiths' property, the sewer pipe was three to four feet deep. The additional dirt over the pipe on the Esmailzadeh property added considerably more pressure on the pipe and increased the likelihood of it breaking in the event of an earthquake, even if the pipe was not encased in concrete.

7

After the Esmailzadehs finished their new home, at least two and a half to three more feet of earth covered the sewer pipe than before the project began.

Saltzberg also observed two concrete vaults in the easement area that contained the sump pump for the Esmailzadehs' property. The pipe ran under one of the vaults. The vault was approximately four feet underground, and the sewer pipe was another approximately three and a half feet under the vault. Accessing the pipe under the vaults was a costly endeavor because workers would have to shore up the vault to prevent it from falling over and breaking if they dug around it. Then they would have to trench underneath the vault and create a larger hole than they otherwise would.

On the Smiths' property, there were trees growing over at least portions of the sewer pipe. When a video snake was run through the pipe on the Smiths' property, the video showed root intrusion into the pipe. As well, the video showed that after the pipe exited the Esmailzadehs' property, it suffered from significant root intrusion.

As the Esmailzadehs were reconstructing their back yard, they planted at least five trees in the easement area, over or just adjacent to the pipe. Saltzberg opined that when the trees grew larger, root penetration would compromise the ability to dig trenches and affect access to the sewer pipe. Saltzberg acknowledged the trees over the pipe on the Smiths' property, and he said those trees could also impact the pipe if their roots grew into it. An excavation would not necessarily be required to inspect the pipe. It could be inspected with a camera inserted into the pipe, as had been done during the pendency of this case. Roots could be cleared from the pipe by "roto root[ing] them" without any excavation, and other debris buildup could be cleared by "hydrocleaning" the pipe with a jet of water. Saltzberg recognized that it was unlikely there would be a need to excavate the pipe, *unless* there was some sort of seismic event.

The Esmailzadehs' expert, Jax Kneppers, also a forensic mechanical engineer, opined the sewer pipe in the easement was currently in a functional, code-compliant condition with an expected service life of 40 to 50 years. He also opined the existence of the trees the Esmailzadehs planted over the easement would not impede the performance of the pipe. He testified the Smiths could clean the length of the sewer pipe in the

8

easement from the cleanout that was located on their own property. Still, Kneppers agreed with the Smiths' expert that the cost of excavating the pipe was unusually expensive because the pipe was deep underground and it had to be excavated by hand due to the backyard location and topography of the area. He also acknowledged the trees the Esmailzadehs had planted over the pipe would make it more difficult to access the pipe. Additionally, the depth of the pipe would require an OSHA[5] permit, bracings, and shoring. If the Smiths wanted to excavate and replace their sewer pipe back in 2005 (before the Esmailzadehs had done their new construction), the cost would have been approximately $2,000. In 2009, after the Esmailzadehs' work had been done, Kneppers thought the same project would cost approximately $31,000. Kneppers opined it was possible to place the pipe within the easement so that there was only three feet of earth above it.

## 2. *Trial Court's Statement of Decision After Phase One Trial*

The court issued its final statement of decision in August 2009. After comparing the words of the easement grant with the trial evidence, the court found the Esmailzadehs' contractors unearthed a different sewer pipe at a location not described by the easement. The grant called for an eight-inch pipe, and the contractors found a four-inch pipe; there was no need for reasonable access every 100 feet because the pipe was only 66 feet in length; all or part of the pipe lay outside the four-foot wide easement described in the grant; there was no evidence of a check valve for the pipe; and no service contract existed to clean the pipe yearly. The court determined the grant language was ignored in locating the sewer line originally, and the pipe had lain where it was located, outside the easement, presumably since 1987. The court found that where the sewer pipe emerged into the Esmailzadehs' property was a function of where it left the Smiths'

---

[5] OSHA stands for the Occupational Safety and Health Administration. Kneppers believed anything deeper than five feet would require the OSHA permit, bracings, and shoring.

9

property, and the Smiths or their predecessors allowed the pipe to leave their property and pass through the Esmailzadehs' boundary line outside of the easement area.

Still, the court concluded it was not reasonable, practical, or fair to require the parties to relocate the pipe so that it was within the originally described easement area. The parties or their predecessors had developed an arrangement outside of the easement grant that appeared to work well for all involved. All else being equal, the arrangement should be left alone -- but all else was not equal, the court found: "The Smiths bear no responsibility nor fault for the current situation. They made no changes in their behavior or in their portion of the sewer line. The Esmailzadehs and their agents[,] though, bear a great deal of fault for an adverse change in what has become an equitable easement." The court held the easement was not just the physical items -- the pipe and surrounding soil -- but also a set of rights and obligations, including "the requirements of access and repair." Even if the sewer pipe had lain in the middle of the easement area and the contractors had not touched it during the Esmailzadehs' construction project, "the Esmailzadehs would still be responsible for the adverse effects on the Smiths['] rights due [to] the changes surrounding the easement that make[] access for maintenance and repair more costly, difficult and dangerous."

The court explained the consent of both parties was needed to make changes affecting the easement,[6] and the Esmailzadehs, knowing their extensive plans for reconstruction, should have consulted with the Smiths before beginning their project. Instead, without contacting the Smiths, the Esmailzadehs built retaining walls in the area

---

**6** The record indicates that, at the time of trial in 2009, the Los Angeles Building Code required a declaration from property owners seeking a building permit that the proposed work would "'not destroy or unreasonably interfere with any access or utility easement belonging to others,'" and in the event this did occur, a substitute easement satisfactory to the easement holder would be provided. (L.A. Mun. Code, § 91.106.4.3.4.)

10

of the assumed and actual easement, built two concrete vaults for their sump pump over the sewer pipe, and placed concrete around the pipe for a short distance in two places.

The court noted the defense expert's testimony indicated that access to the pipe was much more "daunting and dangerous" than before. The pipe would have to be accessed through digging by hand because there was no pathway to the Esmailzadehs' backyard for large pieces of equipment. The depth of the pipe, anywhere from five to seven and a half feet below the surface, required "wood shoring of any trench or hole and implicate[d] OSHA requirements." The portions of the pipe under the sump pumps would require tunneling to access. The Esmailzadehs planted trees over the sewer pipe, making the pipe even more difficult to access because of roots, and the Smiths would be in a position where they might destroy the trees in order to repair a section of the pipe.

In sum, the court concluded the Esmailzadehs' dramatic changes to the environment surrounding the sewer pipe adversely affected the Smiths' easement rights because the costs of access and repair had become much more expensive and dangerous. The court extinguished the prior easement and ordered a new equitable easement with no requirement for an eight-inch pipe, a check valve, yearly cleaning, or access every 100 feet. The court ordered the pipe to remain where it was then located, but the Esmailzadehs had to lower the level of soil over the pipe so that the pipe was no more than three feet from the surface, and the incline of the pipe was to be no less than one-quarter inch for every foot of pipe.[7] Additionally, the court ordered: "The concrete vaults for the sump pumps that are over the pipe are to be removed and relocated. The easement is to be four feet wide with the center line at the mid point of the pipe. No structures, paths or concrete may be placed within this easement. [The Smiths] may have a representative on the Esmailzadehs' property at all times that work on these changes is being made. [¶] Vegetation may be planted within the easement area except for trees

---

[7] Kneppers testified that the Los Angeles Plumbing Code required the slope of the pipe to be no more than one-quarter inch per foot.

11

which are to be planted outside of the easement area, since trees may obstruct access to the pipe."

The court declined to order the Esmailzadehs to remove their rear retaining wall, which the Smiths had sought because the wall was built over a portion of the sewer pipe. The court found there was insufficient evidence they could safely remove the wall without causing adverse consequences for other surrounding properties.

## 3. *Phase Two Trial and Final Judgment*

The phase two bench trial took place from June 21 through July 12, 2011. In its final statement of decision issued in October 2011, the court found for all defendants on each remaining cause of action in the FAC.[8] The court found the Task defendants and other contractor defendants, who were subcontractors of Task Construction, Inc., were negligent in introducing a rock into the Smiths' sewer pipe such that the rock had to be removed around November 2006. Still, the court found the Smiths did not prove this negligence was the proximate cause of any injury to them. Moreover, even had the Smiths proved causation, the Esmailzadehs would not be personally liable because Task Construction, Inc., was an independent contractor, and the Esmailzadehs were not vicariously liable for its or its agents' acts.

The court entered the final judgment on December 21, 2011. Consistent with the phase one statement of decision, the court's judgment extinguished the prior easement; ordered a new equitable easement "with the right of reasonable access to maintain and repair" the pipe; and ordered that the Esmailzadehs put no more than three feet of earth over the sewer pipe, relocate the sump pump vaults over the pipe, put no structures within the easement except their rear retaining wall, and plant no trees within the easement (although other vegetation was permitted).

---

[8] The causes of action in the Esmailzadehs' cross-complaint had been dismissed before or during the phase two trial.

12

The Smiths filed a motion to vacate and set aside the judgment on the ground that the court had incorrect legal and factual bases for its phase one decision. More specifically, the Smiths maintained the court had no basis to extinguish the original easement and impose an equitable one. The court denied the motion. After that, the Smiths and Esmailzadehs filed timely notices of appeal from the judgment.

### 4. *Posttrial Motions for Fees and Costs*

The Smiths and Esmailzadehs, as well as all other parties, filed memoranda of costs. The Esmailzadehs and the other defendants filed motions to strike or tax the Smiths' costs, and the Smiths filed motions to strike or tax the costs of all defendants. The Smiths also filed a motion for attorney fees pursuant to Civil Code section 1717 on the ground that they were the prevailing parties in the phase one trial.

The court granted in part and denied in part the Smiths' motion to tax the Esmailzadehs' costs, and it denied the Smiths' motion for attorney fees. The court held the Smiths failed to show they "won the war" and were the prevailing parties for purposes of fees. In fact, as between the Smiths and the Esmailzadehs, the results were so mixed that neither side clearly prevailed for the purposes of costs pursuant to section 1032.

The Esmailzadehs likewise filed a motion for attorney fees, arguing they were the prevailing parties both as to the results in the action and based on their 998 offer. The court granted in part and denied in part the Esmailzadehs' motion. The court ruled the Esmailzadehs could not recover all their fees in the action because, as between them and the Smiths, the Esmailzadehs were not the prevailing parties in the action -- again, no party was the prevailing party because the judgment was both good news and bad news for both sides. But they could recover all of their post-998 offer attorney fees because the Smiths failed to achieve a better outcome than the 998 offer after trial. The court awarded the Esmailzadehs $478,022 in attorney fees.

The Smiths filed timely notices of appeal from the court's orders on fees and costs, and the Esmailzadehs filed timely cross-appeals.

13

**DISCUSSION**

*1. Esmailzadehs' Appeal Relating to Phase One Statement of Decision*

The Esmailzadehs contend we should reverse or substantially modify the court's permanent injunction regarding the permissible uses of the easement area and the changes the Esmailzadehs must make to the area. They argue their use of the property did not interfere with the Smiths' *primary* easement right -- the right to run the sewer pipe -- and the court based its orders solely on the adverse affect on the Smiths' *secondary* easement right -- the right to access and repair the pipe. They maintain there was no evidence that the placement of extra dirt, planting of trees, or installation of the sump pump vaults over the sewer pipe had any effect whatsoever on the Smiths' primary right to run sewage through the Esmailzadehs' property. The effect of the court's injunction, the Esmailzadehs argue, was to give the Smiths complete dominion over the easement area, which is inconsistent with the law of easements. Except with respect to the planting of trees, we do not agree the trial court erred in fashioning the equitable easement and injunction. We modify the injunction to allow the planting of trees, but otherwise affirm the injunction.

An easement is a burden or servitude upon land. (Civ. Code, § 801.) It represents "an interest in the land of another, which entitles the owner of the easement to a limited use or enjoyment of the other's land." (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 382, p. 446.) "[T]he right to lay underground pipes over the land of another is an easement and is governed generally by the rules of law which govern ordinary easements of way." (*Pasadena v. California-Michigan etc. Co.* (1941) 17 Cal.2d 576, 579.) "The land to which an easement is attached is called the dominant tenement; the land upon which a burden or servitude is laid is called the servient tenement." (Civ. Code, § 803.) In this case, the Smiths' property is the dominant tenement, and the Esmailzadehs' property is the servient tenement.

"[E]very incident of ownership not inconsistent with the easement and the enjoyment of the same, is reserved to the grantor." (*Dierssen v. McCormack* (1938) 28 Cal.App.2d 164, 170.) "The general rule is clearly established that, despite the granting

14

of an easement, the owner of the servient tenement may make any use of the land that does not interfere unreasonably with the easement." (*Pasadena v. California-Michigan etc. Co., supra*, 17 Cal.2d at p. 579.)

Whether a particular use of the land by the Esmailzadehs (the servient owners) was an unreasonable interference with the rights of the Smiths (the dominant owners) was a question of fact for the trial court, and the court's findings based on conflicting evidence bind us on appeal. (*Pasadena v. California-Michigan etc. Co., supra*, 17 Cal.2d at p. 579; *Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 703.) Moreover, the trial court's decision to grant injunctive relief "'rests within its sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion.' [Citation.]" (*Van Klompenburg v. Berghold* (2005) 126 Cal.App.4th 345, 349.) "The exercise of discretion must be supported by the evidence and, 'to the extent the trial court had to review the evidence to resolve disputed factual issues, and draw inferences from the presented facts, [we] review such factual findings under a substantial evidence standard.' [Citation.] We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390.)

Here, the equitable easement fashioned by the court expressly gave the Smiths the "right of reasonable access to maintain and repair" the pipe. The court's determination that the sump pump vaults and more than three feet of earth unreasonably interfered with this right of access was supported by substantial evidence, and we therefore will not disturb the court's judgment. There was evidence from contractor witnesses and both the Smiths' and the Esmailzadehs' experts that the Esmailzadehs had added approximately four feet of earth over the pipe than had existed previously, and this added depth made excavating the pipe much more difficult and expensive. Workers would have to excavate by hand because there was no way to get automated equipment in the Esmailzadehs' backyard. The added depth would also require an OSHA permit and shoring. The sump pump vaults the Esmailzadehs added over the pipe further complicated access because

15

workers would have to shore up those vaults if they were to tunnel around and under them, and the trench would have to be larger to dig around the vaults. The Esmailzadehs' own expert, Kneppers, opined that, all told, excavating the sewer pipe after the Esmailzadehs made these changes would cost approximately $31,000, whereas it would have cost only $2,000 before their construction project.

The Esmailzadehs argue none of this matters because the pipe is in good working order, Kneppers testified the pipe had 40 to 50 more years of service life, and any obstructions could be cleared from the cleanout on the Smiths' property -- essentially, the Smiths will have no need to excavate and repair the pipe. But this is not a certainty. Indeed, the need to excavate and repair the pipe to remove a rock that could not otherwise be cleared was what prompted the Smiths to commence litigation. Moreover, the evidence demonstrated that in the event of an earthquake, the pipe could be damaged and require excavation, especially because (1) it was encased in concrete where it penetrated walls on the Esmailzadehs' property, and the movement of the concrete would make the pipe more vulnerable to rupture, and (2) the additional earth covering the pipe on their property increased the pressure on the pipe and therefore increased the likelihood of it breaking in an earthquake. Obviously, earthquakes are not an uncommon occurrence in Southern California, and we cannot say there would never be a need to excavate the pipe.

The Esmailzadehs also argue secondary easement rights, such as the right to reasonable access in this case, are entitled to less deference than primary easement rights, and an interference with secondary rights is not held to the same standards. This argument lacks merit. It is true enough that a distinction exists between primary and secondary easement rights. "[A] secondary easement which accompanies a principal easement is no more than the right to do such things as are necessary to the enjoyment of the principal easement (for instance, to make repairs, renewals and replacements)," and these secondary rights "must be [exercised] in a reasonable manner without an undue burden on the servient owner." (*City of Los Angeles v. Howard* (1966) 244 Cal.App.2d 538, 543.) But, we are not convinced these particular restrictions on the sump pumps and depth of the pipe are "undue burdens" on the Esmailzadehs. Furthermore, whether we

16

are considering primary or secondary easement rights, the general rule still applies that a servient owner may not unreasonably interfere with the rights of the dominant owner. (*Ibid.*)  And as we have just discussed, substantial evidence supported the court's determination that these uses of the land unreasonably interfered with the Smiths' easement right to access.

The Esmailzadehs further argue the trial court did not properly "balance all of the hardships" between the parties when fashioning the injunction because the court did not analyze how the increased burden on the Smiths "compared with the inability of the Esmailzadehs to make any use of the property in dispute or compared with the 'hardships' already suffered voluntarily by the Smiths with respect to the pipe as it ran under their own property."  (See, e.g., *Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 266-267 ["The trial court's exercise of discretion to determine whether to grant or deny an injunction is based on equitable principles.  [Citation.]  . . .  In exercising that discretion, the court must consider the conduct and intent not only of the defendant, but also of the plaintiff.  [Citation.]  The trial court's consideration of the conduct of the parties must in turn be made in light of the relative harm that granting or withholding an injunction will do to the interests of the parties."].)  This argument also fails to persuade with respect to the sump pump vaults and the added earth.  To begin with, the Esmailzadehs' repeated insistence that the court gave the Smiths an exclusive easement to use the property, or that the Esmailzadehs cannot make "any" use of the property, is simply inaccurate.  The court restricted their use of the four-foot wide strip of land within the easement, but they were not prohibited from using the easement land at all.  Moreover, to the extent they assert the court did not compare their costs of complying with the injunction to the Smiths' costs of access, they do not point to any evidence that their costs were disproportionately great.  They fault the court for not conducting a careful balancing, but they do not cite to the record to show the costs of removing the concrete vaults and extra earth (though we know the approximate costs of access to the Smiths would be $31,000).

17

For the most part, we are not persuaded by the Esmailzadehs' charge that the court did not properly balance the hardships because the same conditions it enjoined on the Esmailzadehs' property existed on the Smiths' property. The pipe was somewhere around three feet underground on the Smiths' property, not seven to eight feet underground as it was on the Esmailzadehs' side. The Esmailzadehs assert the pipe ran under the concrete pool deck and pool on the Smiths' side, but the evidence from Kneppers was that the pipe ran around the pool to the side of the yard bordering the Esmailzadehs' property, where it ran under a planter and parallel to the wall separating the two properties, until it turned and went into the Esmailzadehs' property. Moreover, there was no evidence that if the pipe in fact ran under the Smith's pool deck, the difficulty of excavating the deck was akin to the difficulty of excavating the sump pump vaults, which went to a depth of four feet underground and would require shoring to tunnel underneath them.

The undisputed evidence from both sides, however, showed the pipe on the Smiths' side ran under a planter with several trees in it. To the extent the Smiths voluntarily had trees over the pipe on their property, the same conditions can hardly be called an unreasonable interference on the Esmailzadehs' property. Substantial evidence did not support the determination that the Esmailzadehs' planting of trees was an unreasonable interference with the Smiths' easement rights. We shall modify the judgment to delete this portion of the injunction.

## 2. *Attorney Fees Issues*

The Smiths' contentions on appeal relate to (1) the court's denial of their motion for attorney fees, at least as to their phase one fees, and (2) the court's granting the Esmailzadehs' their attorney fees for phase two of the trial as part of their post-998 offer costs. The Smiths contend the court erred in considering the action as a whole to determine whether they were prevailing parties, and it should have looked only at the phase one trial, because that involved the causes of action on the contract (the grant of easement). They argue that, pursuant to Civil Code section 1717, they prevailed on the contract, and they were thus entitled to their phase one attorney fees. They further argue

18

that, because the second phase of trial involved tort causes of action not on the contract, there was no legal basis to award the Esmailzadehs their phase two fees as part of their post-998 offer costs. We consider the court's denial of the Smiths' fees and the granting of the Esmailzadehs' fees in turn.

**a. Denial of Smiths' Attorney Fees**

"Section 1032 is the fundamental authority for awarding costs in civil actions. It establishes the general rule that '[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding.' (§ 1032, subd. (b).)" (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1108.) Section 1033.5 specifies the items "allowable as costs under Section 1032." (§ 1033.5, subd. (a).) Among the categories of allowable costs it lists are "[a]ttorney's fees, when authorized by . . . [¶] (A) Contract." (§ 1033.5, subd. (a)(10)(A).)

Here, the easement is a contract authorizing attorney fees. To review, the easement's attorney fees provision stated: "In the event of any controversy, claim or dispute relating to this instrument or the breach thereof, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorney fees and costs." Sections 1032 and 1033.5 and the contractual attorney fees provision provide a basis for awarding fees quite apart from Civil Code section 1717.

The rules pertaining to attorney fees under Civil Code section 1717 apply only to causes of action "on a contract." (Civ. Code, § 1717, subd. (a); see *Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1342, disapproved on other grounds by *Santisas v. Goodin* (1998) 17 Cal.4th 599, 614 (*Santisas*).) A party's entitlement to fees for tort causes of action -- those not sounding in contract -- is governed not by section 1717, but by the language of the attorney fee provision. (*Santisas*, at pp. 617, 619; *Maynard v. BTI Group, Inc.* (2013) 216 Cal.App.4th 984, 993; Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2013) ¶ 17:164.10 (rev. # 1, 2013) ["Different rules apply when the recovery is based on tort rather than contract claims. In such cases, fees are awardable only as authorized by statute *or by agreement*, express or implied, between the parties." (Italics added.)].)

19

The Smiths implore us to focus narrowly on the phase one causes of action they contend sounded in contract because they were assertedly the prevailing parties on the contract. Pursuant to Civil Code section 1717, "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).) The court "shall determine who is the party prevailing on the contract," though it "may also determine that there is no party prevailing on the contract." (Civ. Code, § 1717, subd. (b)(1).)

As summarized by our Supreme Court, "[w]hen a party obtains a simple, unqualified victory by completely prevailing on or defeating all contract claims in the action and the contract contains a provision for attorney fees, [Civil Code] section 1717 entitles the successful party to recover reasonable attorney fees incurred in prosecution or defense of those claims. [Citation.] If neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees. '[I]n deciding whether there is a "party prevailing on the contract," the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources.'" (*Scott Co. v. Blount, Inc., supra*, 20 Cal.4th at p. 1109.)

If the court found the Smiths prevailed on the causes of action on the contract, it could have apportioned the fees as the Smiths suggest and awarded fees for only those causes of action. (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129.) The court did not so find, however. It is clear and undisputed the Smiths did not prevail with respect to their phase two tort causes of action. But the court also found, specifically with respect to their phase one causes of action, that "it is difficult to comprehend Plaintiffs' position that they 'prevailed.' They put much emphasis on the fact that the

20

Court, in connection with its Phase 1 Statement of Decision, indicated that Plaintiffs had 'done nothing wrong.' Plaintiffs appear to confuse a finding that they "did nothing wrong' with a finding that they prevailed on their claims. They did not. Notably, they moved to vacate the Phase 1 judgment, and have now appealed that judgment. The gravamen of their complaint in connection with Phase 1 was their contention that the original easement should remain undisturbed and that the Esmailzadehs' wall should be removed. They did not obtain that relief."

"'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion.'" (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.) Specifically, the trial court's determination of the prevailing party under Civil Code section 1717 is an exercise of discretion that we should not disturb on appeal absent a clear showing of abuse of discretion. (*Harvard Investment Co. v. Gap Stores, Inc.* (1984) 156 Cal.App.3d 704, 715, fn. 8.) We do not find such an abuse here.

The conclusion that the Smiths did not prevail sufficiently to justify an award of attorney fees was supported by the record. The Smiths believe because they had an easement and well-functioning, accessible sewer pipe before the lawsuit, and they ended up with an easement and well-functioning, accessible sewer pipe afterward, they necessarily prevailed. When one considers their demands and litigation objectives, though, the phase one statement of decision was both good news and bad news, a mixed result that does not justify a prevailing party award. The Smiths' FAC asked the court to confirm the original easement and force the Esmailzadehs to move the pipe to the location described in it because the Esmailzadehs allegedly moved it during construction. The FAC also sought an order enjoining the Esmailzadehs from building new construction over the easement, which would have included their retaining wall. The Smiths continued to vigorously maintain these positions throughout trial. In their written closing arguments, they argued the Esmailzadehs had unilaterally moved or changed the location of the easement, and they could not force the Smiths to move their easement to the current location of the pipe. Further, the Smiths argued the doctrine of equitable easements did not apply, and the pipe was not in the same place it was before the

21

Esmailzadehs' construction commenced. They also argued the court should force the Esmailzadehs to remove the sump pump vaults *and* the retaining wall over the easement. Beyond the removal of the sump pump vaults, the court did not do as the Smiths requested. It ruled the pipe was originally located outside the area described by the easement through no fault of the Esmailzadehs, and it extinguished the easement, putting in place an equitable easement that did not require the Esmailzadehs to tear down their retaining wall. The Smiths contested the court's decision by filing a motion to vacate the judgment, arguing the court had no basis to terminate the easement by grant and replace it with an equitable easement.

Given the obviously mixed results for the Smiths, the trial court was not wrong to hold the Smiths were not prevailing parties on the causes of action on the contract. (*Deane Gardenhome Assn. v. Denktas* (1993) 13 Cal.App.4th 1394, 1398 ["Typically, a determination of no prevailing party results when both parties seek relief, but neither prevails, or when the ostensibly prevailing party receives only a part of the relief sought."]; *Kytasty v. Godwin* (1980) 102 Cal.App.3d 762, 774 ["Under Civil Code section 1717, attorneys' fees are available to the prevailing party and, as expressed by the trial court, we are unable to determine who is the prevailing party, if there is one. The judgment as well as this opinion must be considered good news and bad news to each of the parties, and in good conscience we cannot say attorneys' fees should be awarded either for the trial or for this appeal."].) The Smiths have failed to show the court's order denying their attorney fees motion was an abuse of discretion.

**b. Granting of Esmailzadehs' Phase Two Attorney Fees**

So, too, have the Smiths failed to show the court erred when it awarded the Esmailzadehs their phase two attorney fees. They contend the phase two causes of action did not sound in contract, and the court therefore could not award attorney fees for this phase under Civil Code section 1717. They are correct in this limited respect, but they miss the point: The court properly awarded these fees as part of the Esmailzadehs' post-998 offer costs.

As noted previously, section 1032 provides a prevailing party is entitled as a matter of right to recover costs. (§ 1032, subd. (b).) Section 998 modifies section 1032. (*Scott Co. v. Blount, Inc., supra*, 20 Cal.4th at p. 1112.) It states: "The costs allowed under Sections 1031 and 1032 shall be withheld or augmented as provided in this section." (§ 998, subd. (a).) Section 998 further provides that when "the plaintiff recovers a judgment less than defendant's pretrial offer, the defendant may recover its costs notwithstanding that the plaintiff is the prevailing party: 'the plaintiff . . . shall pay the defendant's costs from the time of the offer.' (§ 998, subd. (c)[(1)].) Thus, under section 998 a defendant whose pretrial offer is greater than the judgment received by the plaintiff is treated for purposes of postoffer costs as if it were the prevailing party." (*Scott Co. v. Blount, Inc., supra*, at p. 1112.)[9] Even a defendant who ultimately loses at trial "is treated for purposes of postoffer costs *as if* it were the prevailing party" when the defendant's settlement offer exceeded the judgment. (*Id.* at p. 1114.) Section 998 essentially expands the group of parties who may be treated as prevailing parties. (*Mangano v. Verity, Inc.* (2008) 167 Cal.App.4th 944, 951.)

On appeal, the Smiths do not dispute the trial court's determination that the 998 offer was a better outcome than what the Smiths obtained at trial. The only issue is whether the phase two attorney fees were allowable costs.

The postoffer costs allowable under section 998 are the same costs allowed under section 1032 for a prevailing party. (§ 998, subd. (a); *Scott Co. v. Blount, Inc., supra*, 20 Cal.4th at p. 1112 .) Those costs include attorney fees authorized by the pertinent contract, in this case the easement. (§ 1033.5, subd. (a)(10)(A).) The attorney fee provision was rather broadly worded and applied to fees for "*any controversy, claim or dispute relating to this instrument* or the breach thereof." (Italics added.)

---

**9**     In *Scott Co. v. Blount, Inc., supra*, 20 Cal.4th at page 1110, the court applied an earlier version of section 998, but the revisions since then have no impact on our analysis.

The Smiths maintain the phase two tort causes of action had nothing to do with enforcing the terms of the easement or declaring any rights under the easement. However, the attorney fee provision is not limited to enforcing or declaring rights under the easement. The provision covers any dispute merely relating to the easement, and the court found the "entire dispute in this case 'related to'" the easement. Our Supreme Court has found similarly broad language encompasses tort as well as contract causes of action. (*Santisas, supra*, 17 Cal.4th at p. 608.) In *Santisas*, the agreement at issue was a real estate purchase agreement, and the action was brought by the buyers against the sellers and their agents. (*Id.* at p. 603.) They alleged breach of contract, negligence, deceit, negligent misrepresentation, and suppression of fact. (*Ibid.*) The attorney fee provision applied to all claims "'arising out of the execution of th[e] agreement or the sale.'" (*Id*. at p. 608.) The court held this provision "embraces all claims, both tort and breach of contract, in plaintiffs' complaint . . . . If a contractual attorney fee provision is phrased broadly enough, as this one is, it may support an award of attorney fees to the prevailing party in an action alleging both contract and tort claims: '[P]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract.'" (*Ibid.*; see *Xuereb v. Marcus & Millichap, Inc., supra*, 3 Cal.App.4th at p. 1343 [provision for recovery of attorney fees "in any 'lawsuit or other legal proceeding' to which 'this Agreement gives rise'" covered actions in tort as well as contract].)

Here, the tort causes of action alleged the Esmailzadehs were responsible for the backup of effluent in the Smiths' sewer line, which caused physical injury and emotional distress to the Smiths. The Smiths expressly alleged the Esmailzadehs negligently breached their duty "not to interfere with plaintiffs' sewer easement," and this breach caused the Smiths' plumbing to overflow and spew sewage onto the Smiths' property. But for the easement that gave the Smiths the right to run their sewer pipe across the Esmailzadehs' property, this lawsuit between the parties would never have arisen. (*Xuereb v. Marcus & Millichap, Inc., supra*, 3 Cal.App.4th at p. 1343.) The Smiths would not have had a pipe on the Esmailzadehs' property, and the Esmailzadehs would

24

not have had an opportunity to block that pipe.  In this sense, the Smiths' tort causes of action were absolutely a dispute relating to the easement.  (*Ibid.*)  The trial court did not err in awarding the Esmailzadehs their phase two attorney fees.[10]

## DISPOSITION

The last sentence of paragraph 6.a of the judgment is modified so that it now reads:  "Vegetation may be planted within the Equitable Easement area."  Thus, the restriction on the planting of trees within the easement is deleted from the sentence.  So modified, the judgment is affirmed.  The trial court's orders regarding attorney fees are affirmed.  All parties shall bear their own costs on appeal.


FLIER, J.

WE CONCUR:



BIGELOW, P. J.



RUBIN, J.

---

\*          BIGELOW, P. J.                                                        FLIER, J.

---

[10]     The Task defendants filed a respondent's brief "in an abundance of caution" to protect the trial court's ruling awarding their costs, which did not include any attorney fees.  The Smiths have not argued the trial court erred in awarding costs to the Task defendants.  Accordingly, we need not consider the Task defendants' brief.